**Christopher SCOTT, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–04–173 CR.**

Court of Appeals of Texas, Beaumont.

Submitted Feb. 9, 2005.

Decided April 20, 2005.

---

Bill Burnett, Coldspring, for appellant.

Clyde M. Herrington, Dist. Atty., J. Dawn Armstrong, Asst. Dist. Atty., Lufkin, for state.

Before GAULTNEY, KREGER, and HORTON, JJ.

## OPINION

CHARLES KREGER, Justice.

Christopher Scott was convicted by a jury of aggravated sexual assault of a child younger than fourteen years of age. *See* Tex. Pen.Code Ann. § 22.021(a)(1)(A)(i), (2)(B) (Vernon Supp.2005). Scott was sentenced by the jury to fifty years' confinement in the Texas Department of Criminal Justice, Institutional Division. Scott appeals raising three points of error.

In his first point, Scott argues the trial court committed reversible error by not allowing him to cross-examine the State's witness, Steve Burney, as to his mental state. Burney is the father of J.P., the victim. Burney testified he found his son and Scott naked in his son's bedroom between 1:00 and 2:00 a.m. That discovery and confrontation that led to J.P.'s outcry the next day that Scott had sexually assaulted him.

On cross-examination of Burney by defense counsel, the following exchange occurred:

Q. Are you on any medication?

A. Yes, sir.

Q. What kind?

A. Respiridol [sic] and Tegretol.

. . . .

Q. What do those do?

A. Help me—help keep me from being moody.

Q. Okay. You've been to Rusk,[1] haven't you, sir?

A. Yes, sir.

The State then objected on the grounds of relevancy. The trial court sustained the objection and instructed the jury to disregard. Defense counsel requested to make an offer of proof later, to which the trial court agreed. The offer of proof, heard outside the presence of the jury, established Burney had been to Rusk "quite a few times," "[y]ears ago" and recently. Burney said he "went twice to Rusk after this event." Burney further testified he went to Palestine[2] twice, stayed for two weeks every time, and was there just before this event. At that time, Burney was on medication and under a doctor's care.

Burney testified he was currently on medication for his condition and had been diagnosed as chemically unbalanced by the Burke Center. Burney said he was currently under the care of Dr. Learned at the Burke Center. According to Burney, the chemical imbalance does not affect his ability to see, think, or relate to people, he does not have delusions, and does not suffer from paranoia.

On re-direct examination, Burney testified he has also been to Vernon State Hospital, and said, "I've been to quite a few." Burney stated he does "odd things" if he fails to take his medication, but it does not affect his vision or ability to think. Burney said he takes his medication "all the time . . . unless I run out." He was not taking his medication on the night in question because he was stable and did not need it; he had quit taking the medication two months earlier because Dr.

1. Rusk State Hospital.

2. The actual hospital in Palestine is not identified.

Learned told Burney that he did not need it.

Defense counsel offered the evidence into the record, "[f]or the purpose of the credibility of this witness." The trial court refused to admit the testimony on the grounds "[i]t has nothing to do with credibility."

■ The law is well settled that the credibility of the witness, and the weight to be given his testimony, is a matter for the jury to decide. *See* Tex.Code Crim. Proc. Ann. art. 38.04 (Vernon 1979). In passing upon such testimony, the jury is entitled to hear evidence as to the mental status of the witness and the extent of his mental impairment. *See Saucier v. State,* 156 Tex.Crim. 301, 235 S.W.2d 903, 915–16 (1950) (op'n on rehearing). "[T]he mental capacity of the witness is the proper subject of consideration and impeachment as bearing upon his credibility." *Bouldin v. State,* 87 Tex.Crim. 419, 222 S.W. 555, 557 (1920). Therefore, the right to cross-examination includes the right to impeach the witness with evidence that might go to any impairment or disability affecting the witness's credibility. *See Saglimbeni v. State,* 100 S.W.3d 429, 435 (Tex.App.-San Antonio 2002, pet. ref'd), (citing *Virts v. State,* 739 S.W.2d 25, 29 (Tex.Crim.App. 1987)). *See also Sidney v. State,* 753 S.W.2d 410, 413 (Tex.App.-Houston [14th Dist.] 1986, pet. ref'd) (The trial court should have allowed appellant to cross-examine witness on the duration, extent, and treatment of his mental condition).

> However, ... the mere fact that the State's testifying witness has in the recent past suffered or received treatment for a mental illness or disturbance does not, for this reason alone, cause this kind of evidence to become admissible impeachment evidence. If the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a "persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech,"... then, of course, the trial judge should permit the jury to hear this kind of evidence.

*Virts,* 739 S.W.2d at 30.

■ The decision as to whether evidence is admissible must be decided on an ad hoc basis, with great deference being given the trial judge making the initial decision whether that evidence should be admitted for the jury's consideration. *Virts,* 739 S.W.2d at 28. The right of cross-examination is not without limits and the trial judge retains wide latitude to impose reasonable constraints based upon concerns about harassment, prejudice, confusion of issues, and the witness's safety, among other things. *Id.* The trial court's decision to restrict the extent of cross-examination of a witness as to credibility is not subject to reversal absent a clear abuse of discretion. *See Cantu v. State,* 939 S.W.2d 627, 635 (Tex.Crim.App.1997). The offer of proof clearly demonstrates Burney had suffered a recent mental illness or disturbance prior to the night in question. In point of fact, the evidence indicates Burney's illness is ongoing, and persisted through and beyond that night. What the evidence does not show is that it affected his credibility. *See Saglimbeni,* 100 S.W.3d at 435. "Cross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper, provided that such mental illness or disturbance is such that it might tend to reflect upon the witness's credibility." *Virts,* 739 S.W.2d at 30. The testimony elicited does not demonstrate Burney's mental illness affected his perception of events. *Cf. Lagrone v.*

*State,* 942 S.W.2d 602, 613 (Tex.Crim.App. 1997) (To pursue impeachment of a witness' perceptual capacity with evidence of drug addiction, counsel must demonstrate actual drug-based impairment during the witness' observation of the crime). Accordingly, we cannot say the trial court abused its discretion in not permitting the jury to hear the evidence. Issue one is overruled.

Scott's next two points of error concern the testimony of Officer Bo Price during the punishment phase of trial. Point of error two claims the trial court erred in denying the timely request by defense counsel to voir dire a State's reputation witness outside the presence of the jury. Point of error three contends the trial court erred in allowing testimony regarding appellant's reputation from a State's witness not qualified to testify as a reputation witness. The State called Officer Price, a narcotics investigator for the Lufkin Police Department, to the stand. Price testified as follows:

Q. Are you familiar with the Defendant in this case, Christopher Scott?

A. Yes, ma'am, I am.

Q. And are you familiar with his reputation in the community as a peaceful and law abiding citizen?

A. Yes, ma'am, I am.

Q. And is that reputation—

[Defense counsel]: Your Honor, may I take this witness on voir dire for just a minute?

THE COURT: No. You can cross-examine him, though.

Q. (By [The State]) And is that reputation good or bad?

A. Bad.

[The State]: I'll pass the witness, Your Honor.

## CROSS–EXAMINATION

BY [Defense Counsel]:

Q. Officer Price, who have you talked to regarding Mr. Scott's reputation?

A. I'm referring to my personal knowledge of him.

Q. So you don't know what the community thinks of Mr. Scott, only what you think?

A. Yes, sir. I believe you're correct. That's correct.

[Defense Counsel]: Pass the witness, Your Honor.

## REDIRECT EXAMINATION

BY [The State]:

Q. You've also talked to lots of other officers about the Defendant. Is that true?

A. Yes, ma'am.

Q. His name is common—

A. Yes, ma'am.

Q. —with the police department?

A. Yes, ma'am.

[The State]: I'll pass the witness, Your Honor.

[Defense Counsel]: No further questions, Judge.

It is Price's testimony, and the trial court's failure to permit defense counsel to voir dire him, that appellant complains of on appeal.

 Article 37.07, section 3, of the Code of Criminal Procedure provides that after a finding of guilt, evidence may be offered by either party as to the defendant's general reputation or character, or an opinion regarding his character. *See* Tex.Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (Vernon Supp.2005); *Bluitt v. State,* 137 S.W.3d 51, 54 (Tex.Crim.App. 2004). That evidence, however, must be offered in accordance with the well-settled

law of this State allowing appellant's counsel to voir dire the witness prior to his testifying. *See Jones v. State*, 641 S.W.2d 545, 551 (Tex.Crim.App.1982). The *Jones* court "wholeheartedly agree[d]" the trial court erred by refusing to permit voir dire, and noted,

> Because of the many decisions of this Court on this point, we are compelled to classify such error as "grievous error." The proper procedure to be followed is set out in *Crawford v. State*, [480 S.W.2d 724 (Tex.Crim.App.1972)]. In *Crawford v. State*, op.cit., this Court stated the following: "The procedure to be followed is to permit the opposing party to test the qualification of the witness before he testifies as to the defendant's reputation ... if the witness is permitted to first give his opinion and it is then determined that he was not qualified to give such opinion, harm which cannot be cured may be done." For the very obvious reason that was stated in *Crawford, Id.*, the voir dire examination should always occur outside the jury's presence.

*Id.* at 551–52 (citations omitted). *See also Hernandez v. State*, 800 S.W.2d 523, 524 (Tex.Crim.App.1990) (reputation witnesses were questioned on voir dire); *Castillo v. State*, 739 S.W.2d 280, 291 (Tex.Crim.App. 1987) (witness' qualifications were tested in a hearing outside the jury's presence before being permitted to testify as a reputation witness); *Wagner v. State*, 687 S.W.2d 303, 312 (Tex.Crim.App.1984) (prior to testifying about appellant's reputation in the community, witness was taken on voir dire); *Jackson v. State*, 628 S.W.2d 446, 450 (Tex.Crim.App.1982) (State's reputation witnesses were examined on voir dire outside the presence of the jury); *Manning v. State*, 126 S.W.3d 552, 555 (Tex.App.-Texarkana 2003, no pet.) (reputation witness was questioned on voir dire outside the jury's presence before testifying before the jury); *Smith v. State*, 857 S.W.2d 65, 69–70 (Tex.App.-Tyler 1993, no pet.) (appellant sought and received permission to question witnesses on voir dire before they expressed an opinion on appellant's reputation); *Lopez v. State*, 860 S.W.2d 938, 944 (Tex.App.-San Antonio 1993, no pet.) (finding trial court erred by denying appellant's request to voir dire State's reputation witness outside the presence of the jury). In accordance with the authority set forth above, we find the trial court erred in denying appellant's request.

▮▮▮▮▮▮ Our inquiry does not end here, however, as it is equally well-settled law that the mere refusal of a trial judge to allow voir dire examination of such a witness is not per se reversible error. *See Jones*, 641 S.W.2d at 552. For the error to be reversible, the record on appeal must show the witness was not qualified to testify. *Id.* The Court of Criminal Appeals in *Turner* succinctly set forth the requisites for admitting testimony from a reputation witness:

> A reputation witness's testimony must be based on discussion with others concerning the defendant, or on hearing others discuss the defendant's reputation, and not just on personal knowledge. *Jackson v. State*, 628 S.W.2d 446, 450 (Tex.Cr.App.1982). Discussions with other police officers are sufficient to qualify a witness on reputation. *Martin v. State*, 449 S.W.2d 257 (Tex.Cr. App.1970); *see and cf. Hernandez [ v. State*, 800 S.W.2d 523 (Tex.Cr.App. 1990)]. General reputation testimony is admissible even though it is partially based on discussions concerning the offense for which the defendant is being tried, if it is also based on a discussion of matters other than the instant offense. *Castillo v. State*, 739 S.W.2d 280, 292 (Tex.Cr.App.1987), *cert. denied*, 487 U.S. 1228, 108 S.Ct. 2889, 101 L.Ed.2d 924

(1988). Thus, reputation opinion must be at least partially based on a discussion of matters other than the actions or offenses for which the defendant is being tried. *Watson v. State,* 605 S.W.2d 877 (Tex.Cr.App.1979); *Gholson v. State,* 542 S.W.2d 395 (Tex.Cr.App.1976), *cert. denied,* 432 U.S. 911, 97 S.Ct. 2960, 53 L.Ed.2d 1084 (1977).

*Turner v. State,* 805 S.W.2d 423, 429 (Tex. Crim.App.1991).

■ When asked who he had talked to about Scott's reputation, Officer Price answered that he was referring to his own personal knowledge and admitted that he did not know what the community thought of Scott. On redirect, Price agreed he had "talked to lots of other officers" about Scott and that his name was "common" with the police. Price's testimony does not reveal any discussion with members of the community regarding Scott and gives no indication as to whether his discussions with other officers were about matters other than the instant offense. *Cf. Adanandus v. State,* 866 S.W.2d 210, 226 (Tex. Crim.App.1993) (it was established on voir dire that the conclusions of the three officers regarding appellant's reputation were based upon discussions with other police officers concerning various criminal activities of appellant and their own investigations of appellant, including discussions with members of the community during those investigations, and at least ten years of contact with appellant); *Turner,* 805 S.W.2d at 429 (witness learned of appellant's reputation through conversations with community members prior to instant offense and his testimony was not based upon bare knowledge of crime that witness was investigating or upon other specific acts by appellant); *Castillo,* 739 S.W.2d at 291 (witness had based his opinion on talking to several ordinary citizens on various occasions in the last three or four years,

his own experiences with appellant when he was a juvenile, other instances of misconduct, criminal activity the witness heard about but did not personally investigate, as well as his investigation of the instant case).

In *Lopez,* the court found the witness was not qualified where the detective based his opinion on appellant's reputation upon a single report from an unknown informant, received two or three days before the offense at issue. *Lopez,* 860 S.W.2d at 945. The court held the witness "was not substantially familiar with the reputation of the accused since his only familiarity was with alleged specific acts of the appellant; and he did not hear others discuss appellant's reputation." *Id.* Similarly, in *Manning* the court found the trial court abused its discretion in allowing the witness to testify regarding Manning's reputation because the basis of the witness' knowledge was one personal observation and two reports of specific acts. *Manning,* 126 S.W.3d at 555. The court recognized there was no evidence the witness discussed Manning with anyone, official or civilian, within in any community and found such a foundation failed to establish the proper predicate. *Id.* at 556. The court noted "[t]he State failed to ask any questions on redirect examination that might have established the proper predicate...." *Id.*

Nothing in Officer Price's testimony establishes his discussions with other officers concerned matters other than the instant offense. *See Turner,* 805 S.W.2d at 429. Accordingly, the State failed to establish the proper predicate. We therefore find Price was not qualified to testify regarding appellant's reputation.

■ We now turn to a harm analysis pursuant to Tex.R.App. P. 44.2(b) to determine if the error was such as to affect the substantial rights of the accused. "The

inquiry is whether the defendant's substantial rights were violated and whether the appellant's punishment was affected by the judgment. *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997)." *Bain v. State*, 115 S.W.3d 47, 51 (Tex.App.-Texarkana 2003, pet. ref'd). "A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict." *King*, 953 S.W.2d at 271 (citing *Kotteakos v. U.S.*, 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946)). To determine whether Price's testimony affected the jury's decision on punishment, we consider the other evidence the jury heard. *See Bain*, 115 S.W.3d at 51–52.

The State first called Mark Gorman, a juvenile probation officer with Angelina County. Gorman knew Scott for approximately six years through his duties as a probation officer; Scott had been on Gorman's caseload. Scott was first placed on "deferred prosecution" for arson in April of 1999. Scott's next offenses occurred in March and April of 2001 and were two counts of unauthorized use of a motor vehicle, and one count of engaging in organized criminal activity. Scott was placed on probation for one year. As part of the terms of his probation, Scott was randomly drug tested. He tested positive for THC, the active ingredient in marijuana, and admitted to smoking marijuana once after a drug test came back negative. Scott was in school at the time, and had a difficult time due to his behavior. Scott spent most of his time at the alternative school. Scott was detained in the Angelina County Juvenile Detention Center in December of 2001, following probation violations. Gorman testified that he has approximately one contact a month with a "normal probationer" but averaged four or five with Scott. According to Gorman, he had to provide a lot of structure for Scott and "stay on" him. Gorman said if he "stayed on" Scott, Scott did what he asked, but if Gorman did not, Scott would start "to fall."

On cross-examination, Gorman testified he would classify Scott as a follower and someone who was fairly easily influenced. Gorman said Scott associated with a particular "crew," which included mostly family members and engaged in "gang-like activities." Gorman tested Scott a number of times for drugs, probably more than ten, and testified "drugs really weren't an issue with him." Gorman agreed that Scott responds well to structure but was uncertain whether probation would provide the intensive structure he had been providing Scott. Regarding the charge of unauthorized use of a motor vehicle in March of 2001, Gorman testified there were four people in the car, one adult and three juveniles. Gorman agreed it was "a following type of situation."

Gorman agreed on re-direct examination that most of the people Scott spent time with were also on juvenile probation and engaged in criminal behavior, even though, as a condition of probation, Scott was ordered not to spend time with other people on probation. In Gorman's opinion, Scott still had problems following the rules with contact averaging once a week. Gorman clarified his testimony about Scott doing well in a structured environment and stated he "was talking more as detention. Once he was placed in detention, ... he did excellent in detention. We have a level, and four being the highest. He normally stayed on level four. At that time, that was the first time, I think, he'd really had the structure he needed." Gorman testified, "I can honestly say he did excellent in detention with that structured environment that we provide." Gorman agreed detention was "totally different from being on probation."

The record reflects Officer John Davis of the Lufkin Police Department was also called to testify during punishment.[3] Officer Davis testified he was familiar with Scott through his duties as an investigator for juvenile crimes and had dealt with Scott on the offenses of engaging in organized criminal activity, unauthorized use of a motor vehicle, and theft. Davis was asked, "do you have an opinion as to the Defendant's reputation as a peaceful and law abiding citizen in the community?" Davis said, "I don't think it's highly rated.... Basically, I think he's a thief." On cross-examination, Davis testified that was his opinion, not the community's opinion. Davis conceded he did not know what Scott's reputation was in the community.

Tom Hipps, the discipline coordinator at the alternative school for the Lufkin Independent School District, also testified for the State during the punishment phase. Hipps was familiar with Scott and had known him several years. According to Hipps, Scott spent a "good bit" of time at the alternative school. Hipps was unsure what Scott was referred for but testified students are sent there for behavioral reasons. Hipps said Scott performed poorly, misbehaved, refused to do his work, and talked. When students get in trouble at the alternative school, they are sent to Hipps, and he dealt with Scott on many occasions. For the 2000–2001 school year, Scott was sent out of class seventy-six times for discipline reasons, and suspended twelve times, for activities such as throwing over desks, throwing things at teachers and using obscene language. The next year, Scott received nineteen "write-ups" and ten suspensions. The notices include throwing things at and threatening students, and being disrespectful to and throwing things at teachers. Hipps opined that Scott can follow the rules, but chooses not to.

During closing argument, defense counsel asked for probation. No other sentence was suggested. In its closing, the State informed the jury the punishment range was five to ninety-nine years and acknowledged Scott qualified for probation. The State argued against probation, focusing on Scott's inability to follow the rules and the escalation of Scott's criminal activities to the instant offense, the repeated aggravated sexual assault of a ten-year old boy. The State never mentioned Scott's reputation or the testimony regarding it. *Cf. Aleman v. State*, 49 S.W.3d 92, 96 (Tex.App.-Beaumont 2001, no pet.).

■ In examining the record to assess harm, we consider the source and nature of the error; the extent to which the State emphasized it; the probable collateral implications of the error; the weight a juror would probably place upon it (in light of whether the record contains overwhelming evidence supporting the finding in question); and whether declaring the error harmless would encourage the State to repeat it with impunity. *See Roberson v. State*, 100 S.W.3d 36, 44 (Tex.App.-Waco 2002, pet. ref'd). The trial court was the source of the error and the error resulted in the admission of Price's testimony that Scott's reputation was "bad" and his name "common" with police. The State did not emphasize it. In light of the other evidence introduced at punishment, a juror would probably not place much weight on Price's testimony. Since the error was not

---

**3.** In its brief, the State alleges appellant is also complaining of Officer Davis' testimony. While appellant's brief parenthetically alludes to a lack of evidence that Davis was familiar with Scott's reputation in the community, no such argument is presented. Moreover, as no objection was made to Davis' testimony, no such argument would be considered. *See* Tex.R.App. P. 33.1.

the State's, declaring it harmless would not encourage the State to repeat it.

The jury assessed Scott's sentence at confinement for fifty years. In light of the properly-admitted evidence, we cannot say the testimony of Officer Price affected appellant's punishment. *See Bain*, 115 S.W.3d at 51–52. The trial court's error did not have a substantial or injurious influence on the jury's decision; therefore the error is harmless. Issue three is overruled.

The judgment of the trial court is AFFIRMED.