Terrell Deshaun PERRY, Appellant

v.

The STATE of Texas, Appellee.

No. 06–06–00179–CR.

Court of Appeals of Texas, Texarkana.

Submitted June 6, 2007.

Decided Oct. 5, 2007.

Butch Dunbar, Dunbar, Craytor & Morgan, LLP, Texarkana, for appellant.

Bobby Lockhart, Dist. Atty., Nicole Habersang, Asst. Dist. Atty., Bowie County Dist. Atty's Office, Texarkana, for appellee.

Before MORRISS, C.J., CARTER and MOSELEY, JJ.

## OPINION

Opinion by Justice CARTER.

Terrell Deshaun Perry was convicted of murdering Timothy Moore (who had the nickname "Tick") March 28, 2003. Perry

complains on appeal that his right to question the credibility of two witnesses was violated.

### Facts

On the night of the murder, Dolwin White was using cocaine with Perry and Gene Paxton. According to White, to get more cocaine, they went to the home of Moore, from whom White had previously bought cocaine. White testified he walked into Moore's house with Perry and Paxton behind him. After White told Moore he wanted $20.00 worth of cocaine, Perry grabbed Moore from behind and put a pistol to Moore's head. White said he did not know at the time that Perry had a gun; Perry took Moore into another room while White started picking up items of clothing and a "spinner" wheel hub. White said he heard a commotion in another room, then one gunshot. White went into the kitchen where he saw Moore lying facedown on the floor, with Perry kneeling next to him. The three ran out the back door and jumped over a fence. At some point, Perry gave White "a lot" of cash. A police car pulled up, and Perry and Paxton stopped; White kept running to his stepmother's house, where he hid the money. Some time later, Perry came to see White, White retrieved the money, and gave it to Perry. Perry gave White about $500.00.

The other significant evidence came from the testimony of Perry's former girlfriend, Shacretia Forbes, who testified that, around March 27, 2003, Perry did not have any money. After she bailed Perry out of jail, following his arrest on other charges, on the night of the murder, Perry and White went to White's stepmother's house. Forbes said that, before they went to the house, Perry had no money; when he came out, he had money. She further testified that, some time after the murder, Perry started waking up in the middle of the night in a cold sweat and "using the bathroom on his self at night." When Forbes asked Perry about these behaviors, he admitted shooting Moore. Perry told Forbes that he followed White into Moore's house and told Moore they were there to rob him. Perry admitted to Forbes robbing and killing Moore, but claimed the gun went off when he and Moore scuffled.

### Did Trial Court Err in Limiting Perry's Cross–Examination of White?

Perry's first point of error complains he was denied his constitutional right of confrontation of White by being prevented from impeaching his credibility. Outside the jury's presence, evidence was presented by White that he has a history which includes visions of a green man with horns telling him to say things. White acknowledged that, in August 2003, he was "seeing things" who told him to say "terrible things." During the time period he was talking to the police about Moore's murder, White was "seeing people." When asked when he first saw "this" (green man with horns), he responded, "I guess it's all my life. I've been seeing things all my life, ever since I was young." Perry told the trial court he wanted to cross-examine White about these visions. Perry argued to the trial court he was entitled to present testimony about the general capacity of White and whether White could distinguish between "reality and the real world." Perry specifically stated that he did not urge that White was incompetent to testify, but that he should be allowed to question White on this subject to test his credibility. The State argued to the trial court that this was an attempt to present specific instances of conduct of White to attack his credibility and, by virtue of Rule 608(b) of the Texas Rules of Evidence, such an attack was improper. See TEX.R. EVID. 608(b). At no point did Perry argue to the trial court that his constitutional right of

confrontation was being denied. The trial court excluded the testimony, finding that it was a specific instance of conduct for the purpose of attacking credibility and was inadmissible. The court also found the testimony to be more prejudicial than probative.

On appeal, Perry argues that his right to confront White as to his credibility was denied. He primarily bases this contention on *Virts v. State*, 739 S.W.2d 25 (Tex. Crim.App.1987).

The State argues Perry has not preserved an issue regarding the denial of the constitutional right of confrontation. We agree. The Texas Court of Criminal Appeals has made it clear that an objection or argument that evidence is admissible to attack a witness' credibility may involve both the constitutional right of confrontation or evidentiary rules. *Reyna v. State*, 168 S.W.3d 173, 179 (Tex.Crim.App.2005). In order to assert the confrontation objection, it is necessary that a party clearly articulate that the Confrontation Clause demanded admission of the evidence to allow the trial court to rule on the issue. *Id.* at 179–80. In failing to present such an argument or objection to the trial court, the confrontation issue was not preserved for appeal.

The question remaining is whether Perry preserved, by his objection and proffer, the broader issue of credibility and impeachment under the Texas Rules of Evidence. At the trial court, Perry proffered the cross-examination of White for the purpose of testing White's credibility. In his appeal point, Perry argues, "Appellant was denied his right to confrontation of witnesses by being denied to [sic] impeach the credibility of co-defendant and witness Dolwin White, provided by U.S. Const. VI and Tex. Const. art. I, sec. 10." However, in the summary of the argument and in the body of it, Perry refers to his denial of the right to test the credibility of White. He cites Rule 601 of the Texas Rules of Evidence for the proposition that every witness is presumed competent to testify and argues that the issue was not competency to testify, but was of credibility and the mental state of White. So, while Perry did not preserve an issue as to the Confrontation Clause of the United States Constitution, he did preserve the broader issue of credibility and impeachment as provided in the Texas Rules of Evidence. His argument to this Court includes a complaint that his right to test the witness' credibility was denied. Several Rules of Evidence mention or allude to testing a witness' credibility or to impeaching the witness. *See, e.g.*, Tex.R. Evid. 607 ("The credibility of a witness may be attacked by any party ...."), 611(b) ("A witness may be cross-examined on any matter relevant to any issue in the case, including credibility."). The Texas Court of Criminal Appeals has pointed out that an objection or proffer grounded on a credibility issue may have its origin in both the right of confrontation as well as the Rules of Evidence. *Reyna*, 168 S.W.3d at 179. During the argument to the trial court, a discussion of Rule 608 was presented by both Perry and the State. The trial court based its decision to exclude the testimony on the conclusion that this testimony violated Rule 608(b) (specific instances of conduct) and Rule 403 (probative value substantially outweighs the prejudicial effect). We believe that Perry has preserved the issue of denial of his right to test the credibility of the witness based on the Texas Rules of Evidence.

We begin by pointing out the trial court has discretion in the admission or exclusion of evidence. *See Green v. State*, 934 S.W.2d 92, 101–02 (Tex.Crim.App.1996); *Montgomery v. State*, 810 S.W.2d 372,

379–80 (Tex.Crim.App.1990). We will not reverse a trial court whose ruling was within the "zone of reasonable disagreement." *Green*, 934 S.W.2d at 102; *Montgomery*, 810 S.W.2d at 391 (op. on reh'g).

Because of the Texas Court of Criminal Appeals' opinion in *Reyna*, we have found that the constitutional right of confrontation was not preserved for appeal. Most cases we have found use the Confrontation Clause as the basis for analyzing the denial of the right to test the credibility of a witness through cross-examination. Whether viewing the evidence through the prism of the Confrontation Clause or the Rules of Evidence, in each instance the issue-credibility-is the same. Therefore, we will use the same analysis in determining if this is a denial of the right to test the credibility of the witness as is done when determining the same issue based on the Confrontation Clause. If there is error presented, the analysis of the harmfulness of that error will be different for an evidentiary rule violation (nonconstitutional error) than for a confrontation violation (constitutional error).

■ The law is well settled that the credibility of the witness, and the weight to be given his or her testimony, is a matter for the jury to decide. *See* TEX. CODE CRIM. PROC. ANN. art. 38.04 (Vernon 1979). Equally established is the limitation placed on cross-examination by evidentiary Rule 608(b), which precludes attacks on a witness' credibility by way of specific instances of conduct, except for certain criminal convictions.[1] However, the jury is entitled to hear evidence as to the mental status of the witness and the extent of his or her mental impairment. *See Saucier v. State*, 156 Tex.Crim. 301,

235 S.W.2d 903, 915–16 (1950) (op. on reh'g). "[T]he mental capacity of the witness is the proper subject of consideration and impeachment as bearing upon his credibility." *Bouldin v. State*, 87 Tex. Crim. 419, 222 S.W. 555, 557 (1920). Therefore, the right to cross-examination includes the right to impeach the witness with evidence that might go to any impairment or disability affecting the witness' credibility. *See Saglimbeni v. State*, 100 S.W.3d 429, 435 (Tex.App.-San Antonio 2002, pet. ref'd) (citing *Virts*, 739 S.W.2d at 29); *see also Sidney v. State*, 753 S.W.2d 410, 413 (Tex.App.-Houston [14th Dist.] 1986, pet. ref'd) (trial court should have allowed appellant to cross-examine witness on the duration, extent, and treatment of his mental condition).

■ Cross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper, provided that such mental illness or disturbance is such that it might tend to reflect on the witness' credibility. *Virts*, 739 S.W.2d at 30. Virts wished to question his accomplice codefendant. The codefendant witness had committed herself to a mental institution for four to six weeks and received outpatient treatment for up to eight months; Virts was not able to question the witness about those facts, a possible suicide attempt, or evaluations by three mental health professionals and a week of inpatient treatment at a mental institution (these last, following the murder charges). *Id.* The Texas Court of Criminal Appeals held that Virts "should have been permitted to at least broach the subject of [the codefendant witness'] recent mental problems, that she might have had prior to and after the

---

1. **"Specific Instances of Conduct.** Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, other than conviction of crime as provided in Rule 609, may not be inquired into on cross-examination of the witness nor proved by extrinsic evidence." TEX.R. EVID. 608(b).

events that occurred inside [the murder scene], in the presence of the jury." *Id.*

The Beaumont Court of Appeals used the reasoning and analysis from *Virts* in a similar, but notably different, situation. *Scott v. State*, 162 S.W.3d 397, 401 (Tex. App.-Beaumont 2005, pet. ref'd). The victim's father was on medication to keep him "from being moody." He had been admitted to the mental hospitals in Rusk and Palestine for periods of up to two weeks. While some of these hospital admissions occurred "years ago," at least two occurred after the alleged abuse of the witness' son. *Id.* at 400–01. At the time of his testimony, the witness was under a physician's care and taking medication for his condition, which he described as a chemical imbalance. *Id.* He said he was consistent in taking his medications, unless he ran out. The medications did not affect his vision or ability to think. Regarding the night about which he was to offer testimony, he said he had not taken his medication that day because he was "stable" and his doctor had instructed him to quit taking the medicine two months prior. *Id.* The reviewing court pointed out that, while the evidence did show that the witness' condition was ongoing, nothing was admitted to prove that the condition affected the witness' credibility. Therefore, the court of appeals found no abuse of discretion in the trial court's decision to exclude this evidence. *Id.* at 401–02.

In *Norrid v. State*, 925 S.W.2d 342, 346 (Tex.App.-Fort Worth 1996, no pet.), the defendant sought to cross-examine a victim about her psychological treatment and medications. The *Norrid* court distinguished *Virts*, stating it was necessary for Virts to cross-examine his codefendant because her recent mental illness may have affected her credibility and memory of the events at issue. *Id.* at 347. However, because the victim in *Norrid* was not a codefendant and presumably had no knowledge of the defendant's crime until informed by authorities, the court found that her mental state was a collateral matter. *Id.*

■ We have discussed the information presented to the trial court in the pretrial hearing on whether Perry would be allowed to cross-examine White on his history of hallucinations. Also, the State presented a report generated by psychologist Bryan Smith, who evaluated White for competency May 6, 2006. According to this document, White had been treated in mental health facilities as a juvenile. As a child, he had a history of attention deficit hyperactivity disorder, depression, sleep terror, sleep walking, and enuresis. There are references to his intelligence being rated in the range of mental retardation. Corroborating White's own testimony, he had a history of seeing a "monster with devil horns" and a "frog man." The report states it is "not clear whether these were actual hallucinations." In the period of December 1998 to April 2000, White was diagnosed with paranoid schizophrenia and psychotic disorder; he reported "unspecified" auditory hallucinations.

Regarding Smith's contemporaneous observations of White, Smith noted that White appeared "somewhat anxious and bland but not clearly depressive." He denied depression or suicidal ideation; in general, Dr. Smith stated that his analysis was inconclusive because White declined to return for a second day of evaluation. However, Smith did write that White "did report that he will see a 'green man with horns on his head' who will tell him to 'do things.' [White] said that this green man would tell him to watch who he is around because they might try to 'do something' to him and that this man also will curse and tell him to slap somebody but he

indicated that he tries to ignore this voice...."

■ We find Perry's situation with witness White to be analogous to *Virts.* The most telling similarity is that the witnesses sought to be cross-examined in both cases were codefendants, whose testimony is suspect. *See generally Blake v. State,* 971 S.W.2d 451, 453–54 (Tex.Crim.App.1998). Available, relevant adverse evidence that might affect such a witness' credibility should be admitted so that the jury might use it in making the determination of how much weight it should give the witness' testimony. *Virts,* 739 S.W.2d at 27. White's status as a codefendant, combined with his ongoing experiences of hallucinations or visions, takes this case into the realm of conduct contemplated by *Virts:*

> [Where] the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a "persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech,"... then, of course, the trial judge should permit the jury to hear this kind of evidence.

*Id.* at 30. As in *Virts,* we hold that Perry should have been able to cross-examine White regarding White's history of visions and hallucinations.

■ Finally, the State argues that, even if the testimony challenging the credibility of White was relevant, it was proper to exclude it because its probative value was substantially outweighed by its unfair prejudice. *See* TEX.R. EVID. 403. "Unfair prejudice" refers to a tendency to suggest a decision on an improper basis, commonly, though not necessarily, an emotional one. Evidence might be unfairly prejudicial if, for example, it arouses the jury's hostility or sympathy for one side without regard to the logical probative force of the evidence. *Casey v. State,* 215 S.W.3d 870, 879–80 (Tex.Crim.App.2007). A trial court, when undertaking a Rule 403 analysis, must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State,* 210 S.W.3d 637, 641–42 (Tex.Crim.App. 2006).

Here, the probative value of testing the credibility of an eyewitness to the murder scene concerning recent mental illness manifested through bizarre behavior and speech has been explained by the Texas Court of Criminal Appeals in *Virts.* Without this avenue of cross-examination, Perry had no means of presenting White's hallucinations to the jury. It was not a distraction, but was focused on the ability of the witness to relate events he had observed. It was unlikely to unduly prolong the trial. The jury could have considered on a rational basis whether such testimony diminished White's credibility. However, the jury had other evidence which corroborated White's testimony. We do not find that the evidence is unfairly prejudicial, and certainly not to the extent that it substantially outweighs the probative force of testing White's credibility on matters that might affect an interference, due to mental infirmities, in his abili-

ty to perceive events accurately or relate them.

Although the *Virts* court did not conduct a harm analysis, the Texas Court of Criminal Appeals has evaluated similar situations where a defendant was denied the right to cross-examination. Such error is subject to a harmless error analysis:

> In performing a harmless error analysis, the reviewing court must review the entire record and apply a three-prong test.... Under the first prong, the reviewing court must "assume that the damaging potential of the cross-examination [was] fully realized." ... The court must review the error in consideration of the following five factors: (1) the importance of the witness's testimony; (2) whether the testimony was cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5) the overall strength of the prosecution's case.

*Saglimbeni*, 100 S.W.3d at 435–36 (citations omitted).

After "assum[ing] that the damaging potential of the cross-examination [was] fully realized," we will examine the relevant factors.

(1) Importance of White's testimony

(2) Cumulative testimony

White's testimony was very important to the State's case: he put Perry in the victim's home, in the kitchen where the body was found, with a pistol. White heard a shot from the room where Perry had taken Moore; White then saw Moore's body on the floor. While White's testimony was not cumulative, there was other evidence of Perry's guilt.

(3) Evidence to corroborate or contradict White's testimony

White's testimony is corroborated on some material points by other evidence:

Officer Matthew Smith testified that, on the day of Moore's death, he was patrolling in the area near the scene of the crime. According to Smith's report, at approximately 3:30 a.m., he encountered three black males jogging in the area. Due to the time of day and the location—a known narcotics and prostitution area—he stopped two of them (Perry and Paxton), while another ran away. This testimony corroborates White's statements that he, Perry, and Paxton ran away from Moore's house after the murder and that, when the police "pulled up," White continued to run, and Perry and Paxton stopped.

White testified that he dropped a pair of jeans near the fence in the back of Moore's residence and that he took a "spinner" hubcap from Moore's home and threw it down as he was running away. This testimony is corroborated by evidence that police found a pair of jeans near the fence in the back of Moore's residence and by evidence that police found a "spinner" hubcap in a vacant field somewhere directly behind Moore's residence.

In addition, White's testimony is also firmly corroborated by the testimony of Perry's girlfriend, Forbes, that Perry admitted to her that he killed "Tick."

Further, there was no evidence contradicting White's version of the events.

(4) The extent of cross-examination otherwise permitted

Other than this limitation, White was fully cross-examined.

(5) The overall strength of the State's case

Forbes' testimony that Perry admitted to her that he shot and killed

Moore is very significant. An admission of guilt alone is sufficient to convict so long as the admission is corroborated as to the *corpus delicti* of the crime. *Farris v. State*, 819 S.W.2d 490, 495 (Tex.Crim.App. 1990), *overruled on other grounds by Riley v. State*, 889 S.W.2d 290, 301 (Tex.Crim. App.1994). The two elements of proof necessary to prove the *corpus delicti* in a murder case are: (1) that the body or remains of the deceased is found and (2) that the death of the deceased was caused by a criminal act of another. *Self v. State*, 513 S.W.2d 832, 833 (Tex.Crim.App.1974). The circumstances of this case leave virtually no doubt that Moore was killed by a criminal act. He was found lying on his kitchen floor with a fatal gunshot in his torso entering from his back. Further, the fact that many of the details of White's testimony were corroborated by the physical findings strengthens the State's case.

■ As we have determined that Perry failed to preserve his constitutional right of confrontation, the test in determining if the error is reversible is that found in Tex.R.App. P. 44.2(b) ("[a]ny other error ... that does not affect substantial rights must be disregarded"), rather than the test employed for a constitutional violation (must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment). An error affects a defendant's substantial rights for Rule 44.2(b) purposes when the error has "a substantial and injurious effect or influence in determining the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex.Crim.App.1997). Conversely, an error does not affect substantial rights if the appellate court "has fair assurance that the error did not influence the jury, or had but a slight effect." *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim.App.1998).

In determining if the error had a substantial and injurious effect in determining the jury's verdict, we must consider all of the evidence presented. As discussed, much of White's testimony surrounding the events of that night were corroborated by police investigation. The fact that a policeman came upon these three individuals near the scene of the crime running away as White described, at 3:30 a.m., is significant. While White's credibility could have been challenged by reference to his mental problems, much of his testimony was corroborated. His testimony about the events of that evening were straightforward and displayed no signs of an inability to relate the events he had observed. Finally, the testimony of Forbes concerning Perry's admission of guilt weighs heavily in this determination. Based on all of the evidence, we cannot say that the inability to challenge White's credibility due to mental problems had a substantial and injurious effect on the jury's determination of guilt. We find that the effect would, at most, be slight. Therefore, while we find error in failing to allow the cross-examination requested, we do not believe, under the facts of this case, that the error substantially affected the jury's determination and, therefore, the error must be disregarded. *See* Tex.R.App. P. 44.2(b).

## Was It Error To Keep Perry from Cross–Examining Forbes About Her Arrest for Checks?

■ Perry's second point of error complains the trial court erred and denied Perry his right to confront and impeach the credibility of Shacretia Forbes. As we have previously discussed, no mention of the constitutional right of confrontation was presented at the trial court level and, therefore, it is not preserved for appeal.

■ Perry attempted to impeach Forbes' credibility by inquiring if she signed certain checks drawn on his check-

ing account. At trial, Perry asserted that this evidence was admissible to show Forbes' bias. Outside the jury's presence, Forbes testified she had signed several checks on Perry's account with his permission. Perry argues that, since Perry was arrested for a hot check violation, he should be allowed to show that Forbes wrote certain checks on Perry's account. Perry asserts that this information was relevant to show that Forbes was biased against Perry, or had a motive to keep him incarcerated. However, no connection was shown between the checks that Forbes wrote on Perry's account and the checks for which Perry was arrested. Further, there was no contradiction to Forbes' testimony that all checks she wrote were with Perry's express permission.

As we have previously discussed, the trial court has discretion in the admission or exclusion of evidence. *See Green,* 934 S.W.2d at 101–02; *Montgomery,* 810 S.W.2d at 379–80. We will not reverse a trial court whose ruling was within the "zone of reasonable disagreement." *Green,* 934 S.W.2d at 102; *Montgomery,* 810 S.W.2d at 391. The trial court found no relevancy in Perry's proffer, and further found that the testimony was not proper impeachment evidence. The trial court pointed out that Forbes had not been arrested on these allegedly hot checks and that Forbes was not subject to impeachment based on Rule 609. *See* Tex.R. Evid. 609. We find no error. Perry has not shown at the trial court level or on appeal how this testimony would demonstrate Forbes' bias. Otherwise, this evidence is not admissible as impeachment for a crime as there was no evidence Forbes had ever been convicted or even arrested for an offense involving the checks. *See* Tex.R. Evid. 608, 609. No abuse of discretion has been shown. We overrule this point of error.

We affirm the judgment of the trial court.