Opinion filed May 8, 2008











 
 
  
 
 







 
 
  
 
 




Opinion filed May 8, 2008

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh
Court of Appeals

                                                                   __________

 

                                                          No. 11-06-00106-CR 

                                                     __________

 

                                        GLEN
RAMIREZ, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 241st District Court

 

                                                          Smith
County, Texas

 

                                              Trial
Court Cause No. 241-2209-05

 



 

                                             M E M O R A
N D U M   O P I N I O N

 

Glen
Ramirez pleaded guilty to the felony offense of aggravated assault of a peace
officer, Brian Allison, with a deadly weapon.  Tex. Penal Code Ann. '
22.02 (Vernon Supp. 2007).  The jury assessed punishment at life imprisonment.








Appellant
raises three issues on appeal:  (1) the sentence was grossly disproportionate
to the offense committed; (2) the trial court erred in not allowing appellant
to introduce an audio/video recording into evidence that was made while
appellant was being transported to jail shortly after the offense; and (3) the
trial court erred in not allowing appellant to present testimony from a
probation officer as to possible terms and conditions of probation that a court
might impose when a jury  recommends probation under Tex. Code Crim. Proc Ann. art. 42.12, ' 4 (Vernon Supp. 2007). We affirm.

Background
Facts

On
the night of October 8, 2005, members of the Smith County Sheriff=s Department responded to a
9-1-1 call from Wendy Osteen, appellant=s
common-law wife.  Appellant had her up against the refrigerator in their mobile
home with a knife to her throat.  Osteen laid the telephone down before she
could identify herself, and the dispatcher heard them arguing.  Osteen was
screaming.  Appellant screamed at her:

Now,
how long before the cops get here?  Because you dialed 911.  I=m going to shoot at them
when they show up.  They=re
going to be a dead son of a bitch in the morgue because I=m not going to let them get
away without telling me B
I will not give up.

 

Appellant repeated his threat
during the 9-1-1 call:

 

I=m going to shoot them.  If
they show up, I=m
going to shoot them.  It=s
time for me to check out because I=ve
been abused for too long by whores like you that go out and f--k neighbor=s daddies.

 

When
the first deputies arrived, appellant had started his motorcycle.  When he saw
the deputy sheriffs, he ran back inside the trailer.  One of the deputies, B.J.
Williams (an African-American), turned the motorcycle off so that they could
talk to appellant.  Appellant told the deputy, ATouch
my motorcycle again, and I=ll
blow your n----r head off.@ 
Deputy Williams then saw appellant putting a rifle out the window and pointing
it at another deputy, Brian Allison.  Appellant also pointed the rifle at
Deputy Williams at some point.








Deputy
Tommy Goodman testified that he was sent to appellant=s residence as a backup.  He had met appellant
the previous month when appellant allegedly had threatened some residents on
the other side of the mobile home park.  Deputy Goodman tried to reason with
appellant for over an hour.  In response to Deputy Goodman=s request, appellant threw
the rifle out.  However, appellant then said that he was heavily armed with
more weapons; that he would use them if he wanted to, or had to; and that he
would shoot to kill.  Appellant then showed a shotgun to the officers.  At
least three of the officers testified that appellant kept telling them that he
knew the officers were wearing bulletproof vests and that he would shoot at
their heads.

Sergeant
Jim Johnson with the sheriff=s
department was the patrol supervisor for the shift that night.  He also tried
to negotiate with appellant.  It was obvious to both Deputy Goodman and
Sergeant Johnson that appellant was very angry with his wife.  Sergeant Johnson
told appellant that, if he did not surrender, they would have to call in the
Tactical Team (the SWAT team).  Sergeant Johnson acknowledged that the SWAT
team was rarely called.  While talking with appellant, Sergeant Johnson held a
tape recorder and recorded their conversation.  Sergeant Johnson gave appellant
every opportunity to come out, but appellant would not cooperate.  Sergeant
Johnson then called in the SWAT team under Lieutenant Craig Shelton.

When
Lieutenant Shelton arrived, he was advised by Deputy Goodman and Sergeant
Johnson that they had negotiated with appellant for well over an hour but that
the situation just Akept
getting worse and worse.@ 
Finally, Lieutenant Shelton made the decision to shoot two canisters of tear
gas into the trailer.  After being teargassed, appellant did come out, but he
still resisted and would not cooperate.  The SWAT team kept telling him to Aget on the ground, get on
the ground,@ but
appellant had to be forcibly put on the ground by five or six officers who were
wearing tear gas masks.  The team had to forcibly restrain him.  The officers
confirmed that appellant had weapons in the trailer that were loaded and ready
to shoot.  The standoff had lasted two to three hours. 








After
various officers had testified about the events that night, Deputy Floriberto
Arroyo testified about a threat that appellant had made against the prosecutor
just prior to the start of the trial.  Deputy Arroyo said that he was the
officer who transported appellant to the courtroom from the jail.  He and
appellant were sitting in the courtroom, waiting for the trial to begin, when
the prosecutor came in to set up a computer to play the 9-1-1 tape.  The
prosecutor was trying to make certain that the jury would be able to hear the
tape.  When the prosecutor started playing the tape, appellant told Deputy
Arroyo that he did not want to hear the tape unless the jury was there. 
Appellant became very agitated and said that he wanted to leave.  When Deputy Arroyo
told appellant that he could not leave, appellant stood up and said, AIf they let me out, I=m going to find him.@  Appellant was referring
to the prosecutor; however, the prosecutor did not hear the threat.            The
State=s last witness
was Deputy Allison.  Deputy Allison identified the rifle that appellant had
pointed at him and three other weapons, including an extremely long knife that
appellant had held against Osteen=s
throat.  He acknowledged  that appellant had not pointed the rifle at him again
after the first time; however, he said that he had been very frightened because
he knew that a rifle bullet would penetrate his bulletproof vest.  Deputy
Allison also confirmed that the whole time they were out there, appellant kept
saying, AI=m going to hit you in the 
head.  I=m not aiming
for your vest.  I=m
going to shoot you in the head.@

All
of the officers testified that it would concern them if appellant was let back
out on the street.  Deputy Allison was the officer who transported appellant to
jail.  Deputy Allison said that he believed appellant was intoxicated that
night and that, on the way to jail, appellant told him that he had been
drinking Everclear and grape juice.  Deputy Allison said that appellant did not
give him any problems during the fifteen or twenty minute ride to jail but that
appellant was in a plastic-type handcuff that prevented him from moving his
arms around.

Appellant
attempted to call Phillip Johnson, a probation officer, to testify about terms
and conditions of community supervision that a court might set, including a
condition of 180 days in jail.  The court sustained the prosecutor=s objection and did not
allow the testimony.

Osteen,
appellant=s common-law
wife, testified for appellant.  She told the jury that they had been drinking,
that appellant had been drinking Everclear with grape juice, and that appellant
had become extremely angry when she told him about a sexual encounter with
another man.  She related how appellant had held her against the refrigerator
with a knife to her throat and how she had dialed 9-1-1 but had set the
telephone down.  Osteen had run out the door and was not in the trailer when
appellant had the confrontation with the sheriff=s
department.  Osteen emphasized that this was a one-time occurrence and that
appellant had been very good with her grandchildren.  However, she admitted
that appellant had assaulted her twice before to the extent that it hurt.

The
Sentence








In
appellant=s first
issue, he argues that the life sentence assessed by the jury was grossly
disproportionate to the offense committed, in violation of his constitutional
rights under the Eighth Amendment of the United States Constitution and Article
I, section 13 of the Texas Constitution.  Although appellant raises both
federal and state constitutional claims, he acknowledges that this court should
address his claims together.  See Simmons v. State, 944 S.W.2d 11, 14
(Tex. App.CTyler 1996,
pet. ref=d); Davis
v. State, 905 S.W.2d 655, 665 (Tex. App.CTexarkana
1995, pet. ref=d).

Appellant
did not raise the issue of cruel and unusual punishment before the trial court
and has, therefore, waived appellate consideration of this issue.  See Rhoades
v. State, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996); Curry v. State,
910 S.W.2d 490, 497 (Tex. Crim. App. 1995); Steadman v. State, 31 S.W.3d 738, 742 (Tex. App.CHouston [1st Dist.] 2000,
pet. ref=d); see
also Tex. R. App. P. 33.1.  However,
even absent waiver, we conclude that appellant=s
sentence did not constitute cruel and unusual punishment.

The
legislature is vested with the power to define crimes and prescribe penalties. 
See State ex rel. Smith v. Blackwell, 500 S.W.2d 97, 104 (Tex.
Crim. App. 1973); Simmons, 944 S.W.2d at 15; Davis, 905 S.W.2d at
664.  The punishment range for a first degree felony is imprisonment for life
or for any term of not more than ninety-nine or less than five years and a fine
not to exceed $10,000.  Tex. Penal Code
Ann. ' 12.32(a)
(Vernon 2003).  Because appellant=s
punishment falls within the range set forth by the legislature, his punishment
is not prohibited as cruel, unusual, or excessive per se.  See Harris v.
State, 656 S.W.2d 481, 486 (Tex. Crim. App. 1983); Hill v. State,
493 S.W.2d 847, 849 (Tex. Crim. App. 1973).  








That
appellant=s punishment
falls within the range does not end the inquiry.  A prohibition against grossly
disproportionate punishment survives under the Eighth Amendment apart from any
consideration of whether the punishment assessed is within the range
established by the legislature.  See Harmelin v. Michigan, 501 U.S. 957
(1991); Solem v. Helm, 463 U.S. 277, 290 (1983).  Solem had
suggested that an appellate court consider:  (1) the gravity of the offense
compared with the harshness of the penalty; (2) the sentences imposed for
similar crimes in the same jurisdiction; and (3) the sentences imposed for
commission of the same crime in other jurisdictions.  See Solem, 463
U.S. at 292.  In light of Harmelin, the test in Solem appears to
have been reformulated as an initial threshold comparison of the gravity of the
offense with the severity of the sentence.  Then, if that initial comparison
created an inference that the sentence was grossly disproportionate to the
offense, an appellate court should consider the other two Solem factors:
(1) sentences for similar crimes in the same jurisdiction and (2) sentences for
the same crime in other jurisdictions.  See McGruder v. Puckett, 954
F.2d 313, 316 (5th Cir. 1992); Mullins v. State, 208 S.W.3d 469, 470
(Tex. App.CTexarkana
2006, no pet.); Lackey v. State, 881 S.W.2d 418, 420-21 (Tex. App.CDallas 1994, pet. ref=d).  

In
view of the facts of this case we cannot say that appellant=s sentence is grossly
disproportionate.  See Rummel v. Estelle, 445 U.S. 263 (1980). 
Moreover, there is no evidence in the record from which we can compare his
sentence to the sentences imposed on other persons for similar crimes in the
same jurisdiction or to sentences for the same crime, involving similar
circumstances, in other jurisdictions.  See Latham v. State, 20 S.W.3d
63, 69 (Tex. App.CTexarkana
2000, pet. ref=d); Davis,
905 S.W.2d at 664-65.  Appellant=s
first issue is overruled.

The
Audio/Video Recording

In
appellant=s second
issue, he argues that the trial court erred in refusing to allow him to
introduce into evidence an audio/video recording that was made during his
transport to jail.  Trial counsel wanted to show the jury that appellant was
cooperative with Deputy Allison.  Because appellant had elected not to testify,
the prosecutor objected to admission of the audio/video recording on the
grounds that statements of the defendant were inadmissible hearsay, that the
video showing appellant=s
cooperation would simply be a substitute for hearsay oral statements by
appellant (nonverbal acts to prove the truth of the matter asserted), and that
the audio/video recording was cumulative of Deputy Allison=s testimony that appellant
was cooperative on the way to jail.  The trial court ruled that the audio/video
recording was inadmissible.

Appellant
acknowledges that the standard of review for evidence rulings by a trial court
is the abuse-of-discretion standard.  Montgomery v. State, 810 S.W.2d
372, 391 (Tex. Crim. App. 1991).  However, appellant argues that, when the
prosecutor asked questions as to what appellant said in the patrol car on the
way to jail, the prosecutor Aopened
the door@ because he
left a false impression.  Theus v. State, 845 S.W.2d 874, 878 (Tex.
Crim. App. 1992).  Appellant states that the false impression was that
appellant lacked concern for his crime.








The
State had asked Deputy Allison if, during the ride to jail, appellant had been
cooperative.  Deputy Allison responded, AYes
sir.  He gave me no problems.@ 
Deputy Allison also stated that appellant spent most of the trip asking to have
help removing the tear gas from his eyes.  Appellant objected to Deputy Allison=s reference to appellant=s statements about the tear
gas in his eyes because he did not Awant
to leave the jury with the impression that that=s
[sic] the only statement that was made.@ 
The court ruled that appellant could ask questions on cross-examination
concerning appellant=s
statements about the tear gas in his eyes but that appellant could not go into
anything else on the audio/video recording.

Through
cross-examination, Deputy Allison confirmed that appellant conversed in a
normal manner and simply asked Deputy Allison to pull over and help get the
tear gas out of appellant=s
eyes.  We find that the trial court=s
ruling on the inadmissibility of the recording was correct; it certainly was
within the zone of reasonable disagreement.  Torres v. State, 71 S.W.3d
758, 760 (Tex. Crim. App. 2002).  Appellant=s
second issue is overruled.

The
Probation Officer=s
Proposed Testimony

In
appellant=s third and
final issue, he argues that the trial court erred in not allowing the probation
officer assigned to the court to give testimony about terms and conditions that
the court might impose if the jury recommended community supervision. 
Specifically, appellant wanted the jury to know that the court could order
appellant to serve up to 180 days in jail as a condition of community
supervision.  Tex. Code Crim. Proc. Ann.
art. 42.12, '
12(a) (Vernon Supp. 2007).  Appellant argued to the trial court that this
possible condition should be made known to the jury because the prosecutor had
stated to the jury at the outset of the trial that community supervision meant
that appellant could ride down the elevator with them as they left the
courthouse.  We note that, in arguing against community supervision in closing
argument, the prosecutor again emphasized that appellant would go down the
elevator with them and be Aout
with all of us@ as
opposed to the jury deciding that appellant should go to the penitentiary.








Unlike
the guilt phase, the question at punishment is not whether the defendant has
committed a crime but, instead, what sentence should be assessed.  Ellison
v. State, 201 S.W.3d 714, 718 (Tex. Crim. App. 2006); Haley v. State,
173 S.W.3d 510, 515 (Tex. Crim. App. 2005).  In Ellison, the defendant
argued that it was improper for a probation officer to testify at punishment
about a defendant=s
suitability for community supervision because suitability was not an issue for
the jury.  The court rejected this claim, holding that suitability is a matter
relevant to sentencing under Tex. Code
Crim. Proc. Ann. art. 37.07, '
3(a) (Vernon Supp. 2007).  The Ellison court reiterated that the purpose
of the bifurcated trial procedure was to Atake
the blindfolds off the judge or jury when it came to assessing punishment.@  Ellison, 201
S.W.3d at 718; Davis v. State, 968 S.W.2d 368, 372 (Tex. Crim. App.
1998).  

In
Ivey v. State, No. 03-06-00683-CR, 2007 WL 4245892 (Tex. App.CAustin Oct. 19, 2007, pet.
filed), Ivey did not want probation for his DWI conviction and, on appeal,
contended that the trial court erred by admitting testimony from three
witnesses concerning the conditions of probation for the offense.  A probation
officer testified that a defendant would not receive alcohol or substance abuse
counseling if he were sentenced to Astraight@ jail time.  A counselor
then testified regarding the typical counseling requirements for a defendant
placed on probation.  The third witness, an assistant Travis County attorney,
testified about the requirements for a defendant to be eligible for jury
recommended probation under Article 42.12, section 4.  The court held that the
evidence was admissible because Arelevant@ evidence in the punishment
contest is that which helps the jury Atailor
the sentence to the particular offense@
and Atailor the
sentence to the particular defendant.@ 
Ivey, 2007 WL 4245892 at *4; Najar v. State, 74 S.W.3d 82, 86
(Tex. App.CWaco 2002,
pet. dism=d) (quoting Rogers
v. State, 991 S.W.2d 263, 265 (Tex. Crim. App. 1999)).

The
trial court in this case erred in not allowing the probation officer to testify
about the possible conditions of community supervision that the court might or
might not impose.  Appellant could not otherwise counter the prosecutor=s argument that community
supervision meant that appellant would be going down the elevator with them. 
We now turn to a harm analysis pursuant to Tex.
R. App. P. 44.2(b) to determine if the error was such as to affect the
substantial rights of appellant.

The
inquiry is whether appellant=s
substantial rights were violated and whether appellant=s punishment was affected by the court=s error.  King v. State,
953 S.W.2d 266, 271 (Tex. Crim. App. 1997); Bain v. State, 115 S.W.3d
47, 51 (Tex. App.CTexarkana
2003, pet. ref=d).  A
substantial right is affected when the error had a substantial and injurious
effect or influence in determining the jury=s
verdict.  King, 953 S.W.2d at 271.  To determine the effect of the
omission of the probation officer=s
testimony, we consider the evidence the jury heard and the decision of the jury
concerning the appropriate sentence for appellant.








We
need not detail the evidence again.  Every officer testified that he would be
very concerned if appellant were allowed to be out on the street again.  Osteen
testified about appellant=s
holding a knife to her throat and having assaulted her twice before.  The jury
heard appellant=s
voice on the 9-1-1 tape and was told that appellant kept telling the officers
that he would shoot for their heads, not at their bulletproof vests.  Appellant
never did cooperate until he had been teargassed and forcibly put in
handcuffs.  It is clear from the jury=s
assessing the maximum punishment of life imprisonment that the jury was not
considering a recommendation that the court suspend the imposition of the
sentence and place appellant on community supervision under Article 42.12,
section 4.  In light of the evidence, we cannot say that the omitted testimony
of the probation officer affected appellant=s
punishment.  See Scott v. State, 162 S.W.3d 397, 405 (Tex. App.CBeaumont 2005, pet. ref=d); Bain, 115 S.W.3d
at 51-52.  Appellant=s
third issue is overruled.

This
Court=s Ruling

The
judgment of the trial court is affirmed.

 

 

TERRY McCALL

JUSTICE

 

May 8, 2008

Do not publish. 
See Tex. R. App. P.
47.2(b).

Panel consists of:  Wright, C.J.,


McCall, J., and Strange, J.