**Opinion issued September 24, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-00175-CR

———————————

**CELVIN BROOKS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 184th District Court**
**Harris County, Texas**
**Trial Court Case No. 1515314**

---

## O P I N I O N

A jury convicted appellant, Celvin Brooks, of the offense of capital murder.[1]

Because the State did not seek the death penalty and because appellant was younger

---

[1] *See* TEX. PENAL CODE ANN. § 19.03(a)(7) (providing that person commits offense of capital murder if he murders more than one person during same criminal transaction).

than eighteen years old at the time he committed the offense, the trial court automatically assessed appellant's punishment at confinement for life.[2] In three issues, appellant contends that (1) the trial court erred when it denied his motion for mistrial because he was not afforded the opportunity to effectively cross-examine a key State witness concerning the witness's mental health history; (2) the trial court erred by refusing his request to submit a jury instruction on the lesser-included offense of murder; and (3) Texas's statutory scheme of automatically sentencing juvenile defendants who have committed capital felonies to confinement for life with the possibility of parole after forty years is facially unconstitutional and denied him due process because the scheme does not allow for an individualized sentencing hearing or for any meaningful opportunity of release. *See* TEX. GOV'T CODE ANN. § 508.145(b) (providing that person serving life sentence under Penal Code section 12.31(a)(1) for capital felony "is not eligible for release on parole until the actual calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years").

We affirm.

## Background

Demarquise Edwards, one of the complainants, lived in an upstairs apartment in the Arbor Court apartment complex in north Houston and was known for selling

---

[2] *See* TEX. PENAL CODE ANN. § 12.31(a)(1).

2

"drank," a mixture of codeine and a beverage, usually soda. On March 20, 2015, Houston Police Department (HPD) officers were dispatched to Edwards's apartment after receiving reports that a shooting had occurred. When officers arrived, they discovered the bodies of Terrell Paynes, lying on a couch in the living room of the apartment, Kiara Jackson, lying on the floor of the bedroom, and Edwards, lying on the kitchen floor. Each of the complainants had suffered multiple gunshot wounds: Paynes was shot in the face and neck; Kiara Jackson was shot in the head and right leg; and Edwards was shot once in the left shoulder, three times in the back, and twice in the head.

Cassandra Crosby, who, at the time, was a crime scene investigator with HPD, collected six fired cartridge casings from Edwards's apartment. All of the casings were the same caliber—nine millimeters—but were made by three different manufacturers. Crosby also collected one bullet fragment from the dining room and another bullet fragment that was lying on top of Kiara Jackson's body. Crosby observed drug paraphernalia in the apartment, including scales and narcotics located in the kitchen, in some cabinets, and in the washing machine.

HPD Homicide Division Sergeant C. Cegielski did not have any immediate leads on who had committed the shooting at Edwards's apartment, but a few days after the shooting he began to receive tips through Crime Stoppers. Ultimately, after researching the tips, Cegielski learned that a silver truck had been seen fleeing the

scene after the shooting, and he developed three suspects in the shooting: appellant, Broderick Bell, and Kevoughn Fields. Appellant spoke with Cegielski shortly after the shooting and voluntarily provided a saliva sample. Appellant also consented to the release of his cell phone records to HPD.

Raveen Jones lived in the Arbor Court apartments in a building close to Edwards's. Jones's cousin, Casper, had been friends with appellant, Bell, and Fields before he was shot and killed at the Haverstock Hills apartment complex in February 2015, approximately one month before the shooting at Edwards's apartment. The Haverstock Hills complex was a ten or fifteen minute car drive from Arbor Court. Jones had met appellant, Bell, and Fields, and she had seen them at Casper's funeral. Two days before the shooting at Edwards's apartment, she saw appellant, Bell, and Fields standing by a white or silver truck in the parking lot at Arbor Court. She thought it was unusual to see these three men at Arbor Court because, prior to this occasion, she had only seen them at Haverstock Hills and at Casper's funeral. Jones did not stop to talk to the men, but they called out to her boyfriend, Andra Coleman, who also did not stop to talk. The next day, the day before the shooting, Jones saw appellant walking alone around Arbor Court towards Edwards's apartment. The silver truck she had seen the day before was again parked in the parking lot. Jones was away from Arbor Court most of the day of the shooting, and, by the time she

4

returned home, the police had already arrived to investigate the shooting. She did not see appellant, Bell, or Fields that day.

Duke Catalon was visiting his cousin at the Arbor Court apartments on the evening of the shooting. He was about to leave when he saw his friend, Terrell Paynes, and they stopped to talk. Paynes had locked the keys inside Edwards's car, and Catalon tried to help them resolve this problem. This included making an unsuccessful trip to a local Auto Zone to buy a "slim jim" to open the car door. Catalon returned to Arbor Court, but he then left to go pick up his sister. Later in the evening, on his way back to Arbor Court, Catalon texted Paynes to learn whether he had been able to unlock Edwards's car. Paynes responded that they were unable to unlock the car. Catalon sent Paynes another text message, but Paynes did not respond. Catalon called a friend of his, Myke Henix, who lived with Edwards, and Henix gave Catalon Edwards's cell phone number. Like Paynes, Edwards did not answer his phone when Catalon called him. Catalon then called one of Paynes's friends, whose nickname was Smoke, and asked him if he knew what was going on. Smoke told Catalon that he would investigate.[3]

When Catalon arrived back at Arbor Court, he saw a brown Buick and some men standing around it. While walking around the apartment complex, he saw a

---

[3]     Smoke was the person who discovered Edwards, Paynes, and Kiara Jackson's bodies in Edwards's apartment and called 9-1-1.

white truck[4] parked near Edwards's apartment. When asked if he saw any people around the truck, Catalon testified that he saw one person running to the truck from the direction of Edwards's apartment, but he did not see this person actually leave Edwards's apartment. Catalon also stated that, while he was walking through the apartment complex, he heard a loud noise, but he did not hear any gunshots. He started running up the stairs to Edwards's apartment, but then he saw Smoke, who told him that everyone inside the apartment was dead. Catalon could no longer see the white truck.

Dontay Bradley lived with his cousin, Raveen Jones, at Arbor Court in March 2015. He had been visiting a cousin who lived in a nearby apartment when he came back to Arbor Court on the evening of the shooting with his brother, Dominique Bradley, and Jones's boyfriend, Andra Coleman. When they got out of Coleman's car, a tan Buick, Bradley saw appellant, Bell, Fields, and a fourth person he did not know standing around a truck and wearing all black. Someone standing around the truck called out to Coleman, who went over to speak with them.

Bradley, his brother, and Coleman all went back to Jones's apartment and stayed there until they heard gunshots, at which point Bradley went out onto his

---

[4] The State showed Catalon a picture of a truck and asked him if, during the investigation of the case, the prosecutors had shown him this picture before and if he recognized it as the truck he had seen at the Arbor Court apartments. Catalon replied that the truck in the picture was the one he saw at Arbor Court, and he agreed with the prosecutor that the truck was light silver, not white.

balcony and saw three people wearing all black running "from upstairs" towards the truck that he had seen earlier. It appeared that these three people were the same ones he had seen around the truck when he arrived back at Arbor Court. Bradley could not see the features of any of these three people, but he stated that one was tall and one was short. He believed that appellant ran down the stairs first—followed by Bell and then Fields, after several minutes—because appellant was the shortest of the three people. When they reached the truck, none of these three people got into the driver's seat. Bradley saw the truck drive away from Arbor Court.

Shakeitra Woods also lived at Arbor Court. She had been friends with Edwards for years and was distantly related to appellant through marriage. Woods and Edwards lived in the same building, but their apartments faced different parts of the complex. On the evening of the shooting, Woods saw a lot of people wearing blue latex gloves standing near a pedestrian gate in the complex, and she saw a gold Buick pull up and stop near this group for a few minutes. After a little while, Woods left her apartment to go visit the resident who lived in the apartment underneath Edwards's apartment. On the way to this apartment, she noticed a silver truck parked near a stop sign, and she also noticed that the group of people she had seen earlier were no longer in sight.

When Woods arrived at the apartment below Edwards's apartment, the resident did not immediately answer the door, and when he did, he did not open the

door all of the way, he had all the lights off, and he told Woods, "I don't know what they got going on upstairs; but you need to move around from right here." Woods could hear cabinets opening and being slammed closed in Edwards's apartment. Before she could go back to her apartment, someone ran down the stairs from Edwards's apartment towards the silver truck. Woods started walking back to her apartment, but she kept her eyes looking down at the ground and her cell phone. She heard one gunshot and then heard another person run down the stairs from Edwards's apartment carrying a bag.[5] This person also ran towards the truck, and the truck fled the apartments. Woods was not able to make an identification of any of the people she saw in the Arbor Court parking lot or whom she saw running from Edwards's apartment, and she stated that she had never seen appellant at Arbor Court. Shortly after the shooting, Woods and her boyfriend left Arbor Court; when they were near the Hardy Toll Road, she saw the same silver truck she had seen at Arbor Court, swerving through traffic and quickly driving east towards Highway 59.

At the time of appellant's trial, Andra Coleman was in custody awaiting sentencing in federal court for robbery charges. The State had told Coleman that if

---

[5] The prosecutor asked Woods if she turned to look at the person who ran past her, and when she replied that she did not, the prosecutor asked how Woods knew that they were carrying a bag. She testified that she could hear the bag, stating, "I heard the bag rambling when they [were] running."

he provided truthful testimony in appellant's trial, the prosecutors would tell the U.S. Attorney's Office and the federal district judge of his cooperation.

Coleman knew Edwards and had sold guns to him on previous occasions. He had also known appellant, Bell, and Fields since 2014, having met them through Jones's cousin Casper. Two days before the shooting at Edwards's apartment, Coleman saw appellant, Bell, and Fields at Arbor Court in a silver truck parked in the parking lot near Edwards's apartment. On the day of the shooting, Coleman again saw appellant, Bell, and Fields at Arbor Court standing outside the same silver truck and in the same general location. Appellant, Bell, and Fields, who were wearing all black with black gloves, called out to Coleman, who walked over to speak with them. Appellant asked Coleman, "What [do] you know about the drank man?" Coleman clarified that appellant was referring to Edwards. Appellant told Coleman that he "already went to go check it out" and "it's good," which Coleman interpreted as appellant and his friends were intending to rob Edwards. Coleman told appellant "that's a suicide mission" and that he "sell[s] guns to these people." Coleman then left Arbor Court in his car, a tan Buick.

When Coleman returned to Arbor Court, he was in his car near the apartment complex office when he heard several gunshots. He could see the silver truck still parked by a gate, and he saw three men running to the truck. He recognized these men as appellant, Bell, and Fields. Coleman then left Arbor Court again, this time to

9

pick up Jones. By the time he returned to Arbor Court with Jones, law enforcement had arrived at Edwards's apartment. Coleman spoke with Bell a few weeks later at Haverstock Hills, and they discussed what had happened on the day of the shooting. Bell seemed "happy" and "normal," and he did not appear to be bothered by what had occurred.

Dequan Jackson, who, at the time of trial, was in custody at the Harris County Jail for unrelated charges, and appellant are cousins. Both Dequan and appellant were seventeen at the time of the shooting and twenty at the time of appellant's trial. Dequan was acquainted with Bell, Fields, Raveen Jones, and Jones's cousin Casper. On March 21, 2015, the day after the shooting at Edwards's apartment, Dequan went to Fields's girlfriend's apartment at Haverstock Hills. Appellant, Bell, and Fields were all present. When Dequan went inside the apartment he saw "money flashing around, drank on the counter." Everyone present had money, and it was a lot more money than any of Dequan's friends typically had at any given time. Dequan asked where the group got the money, but no one wanted to tell him.

Later that morning, Dequan and appellant left the apartment to buy cigarettes at another apartment in the Haverstock Hills complex. Dequan again asked appellant where they had gotten the money and the drank. Appellant stated, "I caught a body," which Dequan interpreted to mean that appellant had killed someone. Appellant also told him, "I ran in. We ran in. Like, G [Fields] put us on a lick," meaning a robbery.

10

Appellant clarified that it was Bell, Fields, and he who were involved, and he told Dequan that "[t]hey ran in, started shooting." Dequan testified, "They just start shooting. [Appellant] went inside the room and started shooting the female [Kiara Jackson], and [Bell] was over the counter shooting the dude [Edwards] that was in the kitchen." Appellant also told Dequan that he had taken a handgun from Edwards's apartment, and Fields had taken money and drank. Appellant told Dequan that this occurred at Arbor Court, but he did not provide any further details. For about two or three months around the time of the shooting, Dequan had seen appellant driving a silver truck.[6] Appellant would typically park this truck at a daycare center next to the Haverstock Hills complex.

Near the end of the State's direct examination of Dequan, the prosecutor approached the bench and stated that she intended to question Dequan about an incident that had occurred in December 2017 at the Harris County Jail, in which appellant and several other people entered Dequan's cell and appellant assaulted Dequan and called him a "snitch." Defense counsel objected to the admissibility of this evidence.[7] Dequan testified concerning this incident outside the presence of the

---

[6]   The prosecutor showed Dequan the same picture of a silver truck that she had shown Duke Catalon, and Dequan identified it as the truck he had seen appellant driving.

[7]   The trial court eventually allowed the State to pursue this line of questioning, and Dequan testified before the jury concerning this altercation with appellant. Dequan also testified that, two days before his testimony in appellant's trial, he was in the

jury. Defense counsel then stated that he wished to conduct a voir dire examination of Dequan outside the presence of the jury concerning his competency as a witness, based upon Dequan's acknowledgement that he had not completed ninth grade and "based on his mannerisms and answers on this." The trial court allowed defense counsel to conduct this questioning.

Dequan acknowledged that he had been enrolled in special education classes before he left school in the ninth grade. He also testified that he receives social security disability payments because he has been diagnosed with ADHD and bipolar disorder. He stated that his counsel for his unrelated pending charges was aware of this diagnosis, but he had never informed the prosecutors in appellant's trial of his mental health history, and he was not sure if his counsel had informed them. Dequan testified that he takes medication for both ADHD and bipolar disorder, but he was not taking medication in March 2015, when the shooting occurred.

Defense counsel also questioned Ray Castro, Dequan's appointed counsel, concerning Dequan's mental health history and competency. Castro was aware that Dequan had been diagnosed with bipolar disorder. Castro also testified that, early in 2016, he had had Dequan examined for competency to stand trial in his pending cases, and Dequan was found competent to stand trial. The trial court admitted a

tunnel waiting to go to the courthouse from the jail when appellant came out of a holding cell and told him, "You're a snitch. When I get out, I'm going to kill you."

copy of the report finding Dequan competent. The trial court also stated that it saw "no further need to have another competency examination" of Dequan because Dequan had already been found competent and the court's opinion was "going to be that he is competent to testify based upon this report that has been presented."

The next morning, defense counsel again raised the question of Dequan's competency as a witness and moved for a mistrial to "get the [mental health] records that we need to effectively deal with this and perhaps have a pretrial determination if [Dequan's] competency returns." Defense counsel also orally requested a three-day continuance to allow time to obtain and review Dequan's mental health records, and counsel requested "wide latitude" in conducting cross-examination of Dequan on these issues. After hearing further testimony from Castro outside the presence of the jury concerning Dequan's competency and his behavior when he was on and off his medication, as well as testimony from Dequan's mother concerning his mental health history, the trial court denied appellant's motion for mistrial and motion for continuance. The trial court granted the request for wide latitude on cross-examination, and defense counsel was able to question Dequan in front of the jury concerning his diagnoses, his medications, the fact that he was not taking his medications at the time of the shooting, and the fact that he had consumed codeine on the day he spoke with appellant about the shooting.

On March 22, 2015, two days after the shooting, Harris County Sheriff's Office Deputy R. Burgess was dispatched to a daycare center located next to the Haverstock Hills apartment complex concerning a silver truck that needed to be towed from the location. Burgess was not involved in conducting an inventory search or any processing of the truck, but he ensured that the truck was towed to a lot owned by the Harris County Sheriff's Office. Burgess identified a picture of the truck that he had towed to the Sheriff's Office lot. This truck was the same truck that Duke Catalon identified as having been present at Arbor Court on the evening of the shooting and that Dequan Jackson identified as having been driven by appellant around the time of the shooting.

During the inventory search of the truck, officers recovered, among other things, a cigarette butt and a McDonald's receipt dated March 21, 2015. Officers also dusted and swabbed various surfaces of the truck in the hope of recovering fingerprints or a DNA profile. Deputy D. Payavla compared appellant's known fingerprint to a fingerprint observed on a seatbelt buckle of the truck and concluded that the fingerprints matched. Dustin Foley, a DNA analyst with the Harris County Institute of Forensic Sciences, testified that the swab of the interior passenger door handle of the truck had a DNA profile with a major and minor contributor to the mixture, and appellant could not be excluded as a possible major contributor. Appellant also could not be excluded as the major contributor to a DNA mixture

14

found on a swab of the passenger seat. Additionally, appellant could not be excluded as the sole contributor of the DNA profile found on the cigarette butt recovered from the truck.

Ryan Hookano, also with the Harris County Institute of Forensic Sciences, examined the cartridge casings and bullet fragments recovered from Edwards's apartment and from the complainants' autopsies. He testified that of the six cartridge casings recovered from Edwards's apartment, five were fired from the same firearm, a nine millimeter semiautomatic firearm. The remaining cartridge casing recovered from the apartment was also fired from a nine millimeter semiautomatic firearm, but upon examining the mark that the firing pin made on the cartridge, Hookano determined that this casing was fired from a different handgun.

Hookano also examined the bullet fragments recovered during the complainants' autopsies. The fragments recovered from the autopsies of Paynes and Kiara Jackson were both consistent with being from "the .38 caliber family" and fired from a nine millimeter semiautomatic firearm, but two of the fragments recovered during Edwards's autopsy were from "the .32 caliber family" and were consistent with being fired from a revolver. Hookano stated that those two fragments recovered from Edwards's autopsy could not have been fired from the firearms used to shoot Paynes and Jackson. Three other fragments recovered during Edwards's autopsy were from "the .38 caliber family," but had different types of markings from

15

the fragments recovered from the autopsies of Paynes and Jackson. Hookano thus concluded that it appeared that three different firearms were used during this shooting. No firearms were recovered in this case, so Hookano could not compare the cartridge casings recovered from the apartment to casings fired from a known handgun.

Appellant was indicted for capital murder, specifically, for causing the deaths of three individuals during the same criminal transaction. The jury charge included an instruction on the law of parties. Appellant requested that the trial court also include an instruction on the lesser-included offense of murder, but the court denied this instruction. The jury found appellant guilty of the charged offense of capital murder. Because appellant was seventeen years old at the time of the offense and the State did not seek the death penalty, appellant's punishment was automatically assessed at confinement for life with the possibility of parole after forty years. This appeal followed.

## Effective Cross-Examination of Witness

In his first issue, appellant contends that the trial court erred when it denied his motion for mistrial, made when defense counsel learned during trial that Dequan Jackson had a history of mental illness, because counsel was unable to effectively cross-examine Dequan regarding his mental health history.

16

## A.      *Standard of Review and Governing Law*

"A mistrial is the trial court's remedy for improper conduct that is 'so prejudicial that expenditure of further time and expense would be wasteful and futile.'" *Hawkins v. State*, 135 S.W.3d 72, 77 (Tex. Crim. App. 2004) (quoting *Ladd v. State*, 3 S.W.3d 547, 567 (Tex. Crim. App. 1999)). Only in extreme circumstances, when the prejudice from the improper conduct is incurable, will a mistrial be required. *Id.*; *Simpson v. State*, 119 S.W.3d 262, 272 (Tex. Crim. App. 2003) ("Mistrial is appropriate for only 'highly prejudicial and incurable errors.'"). Whether an error requires a mistrial must be determined by the particular facts of the case. *Ocon v. State*, 284 S.W.3d 880, 884 (Tex. Crim. App. 2009). We review a trial court's ruling on a motion for mistrial for an abuse of discretion. *Hawkins*, 135 S.W.3d at 77. We view the evidence in the light most favorable to the trial court's ruling, considering only the arguments before the court at the time of the ruling. *Ocon*, 284 S.W.3d at 884. We must uphold the trial court's ruling if it was within the zone of reasonable disagreement. *Id.*

Generally, every person is competent to testify unless the Rules of Evidence provide otherwise. TEX. R. EVID. 601(a). Rule 601(a) provides that "[a] person who is now insane or was insane at the time of the events about which the person is called to testify" and a person "whom the court examines and finds lacks sufficient intellect

17

to testify concerning the matters in issue" are considered incompetent to testify as witnesses. *Id.*

Texas Rule of Evidence 611 provides that "[a] witness may be cross-examined on any relevant matter, including credibility." TEX. R. EVID. 611(b); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (providing that jury is exclusive judge of facts proved and of weight to be given to testimony). In determining the credibility of a witness and the weight to give to his testimony, the jury is entitled to hear evidence concerning the witness's mental status, mental capacity, and the extent of any mental impairment of the witness. *See Scott v. State*, 162 S.W.3d 397, 401 (Tex. App.—Beaumont 2005, pet. ref'd). The defendant's right of cross-examination thus includes "the right to impeach the witness with evidence that might go to any impairment or disability affecting the witness's credibility." *Id.*; *see also Saglimbeni v. State*, 100 S.W.3d 429, 435 (Tex. App.—San Antonio 2002, pet. ref'd) ("The right to cross-examination includes 'the right to impeach the witness with relevant evidence that might reflect bias, interest, prejudice, inconsistent statements, traits of character affecting credibility, or evidence that might go to any impairment or disability affecting the witness's credibility.").

The Court of Criminal Appeals, in a 1987 case, addressed the propriety of cross-examining a State's witness concerning her mental health history and stated:

> Cross-examination of a testifying State's witness to show that the witness has suffered a recent mental illness or disturbance is proper,

18

provided that such mental illness or disturbance is such that it might tend to reflect upon the witness's credibility. However, simply because the term "mental illness" is "relative in force, there being a wide range of severity," from mere "nervousness and the mild transient situational personality disorder, through the psycho neuroses, to the thoroughly debilitating psychoses," the mere fact that the State's testifying witness has in the recent past suffered or received treatment for a mental illness or disturbance does not, for this reason alone, cause this kind of evidence to become admissible impeachment evidence. If the witness is shown to have been suffering from a recent mental illness, prior to the occurrence of the event in question, and such might be considered a "persistent disabling disturbance of his mental and/or emotional equilibrium, manifested through persistent maladjustment and more or less irrational, even bizarre behavior and speech" whether psychic or organic in origin, then, of course, the trial judge should permit the jury to hear this kind of evidence. On the other hand, if the witness's mental illness or mental disturbance occurred in the remote past, and there is no showing that such has been revived, the fact that the witness has suffered in the remote past a mental illness or mental disturbance should not be admitted into evidence because such would probably be totally irrelevant and immaterial to the defendant's trial.

*Virts v. State*, 739 S.W.2d 25, 30 (Tex. Crim. App. 1987) (citations omitted); *Perry v. State*, 236 S.W.3d 859, 867 (Tex. App.—Texarkana 2007, no pet.) (following *Virts* and stating that "[a]vailable, relevant adverse evidence that might affect" witness's credibility, such as co-defendant's history of hallucinations, "should be admitted so that the jury might use it in making the determination of how much weight it should give the witness' testimony").

**B.     *Analysis***

Here, after Dequan Jackson testified on direct examination concerning his encounter and conversation with appellant at the Haverstock Hills apartment

19

complex the day after the shooting, the State and defense counsel questioned Dequan outside the presence of the jury concerning an incident that occurred in the Harris County Jail in December 2017, in which appellant and others entered Dequan's cell, called him a "snitch," and assaulted him. The trial court requested that counsel provide relevant case law before ruling on the admissibility of this evidence. Defense counsel then referred to Dequan's testimony on direct examination that he had not finished the ninth grade and stated that "based on his mannerisms and answers on this, I'd like to conduct some voir dire outside the presence of the jury now as to his competency." The trial court allowed this questioning to occur.

During this cross-examination, Dequan testified that he had taken special education classes in school, that he stopped taking those classes in seventh grade, and that he stopped going to school in ninth grade. He did not know if he had ever taken an IQ test, but he testified that he had never been diagnosed with an intellectual disability. He testified that he received social security disability checks because he has bipolar disorder, for which he takes medication. Dequan, who was represented by counsel for pending unrelated charges, stated that his counsel was aware of his bipolar diagnosis, but he did not know if his counsel had informed the State of this diagnosis, and he himself had not told the prosecutors during his meetings with them. He also testified that he had been diagnosed with ADHD and that he currently takes

20

the medication Celexa. He testified that he was not taking medication in 2015, when the shooting occurred.

Defense counsel then objected to Dequan's testimony on the basis that he was never given notice that Dequan had a mental disorder or that he received social security disability payments, which constitutes "valid impeachment information as to his perception and memory." Defense counsel also requested that the trial court issue an order allowing him access to Dequan's "medical records from both the jail for the last couple of years and the school." The trial court did not immediately rule on this objection and request.

Defense counsel questioned Dequan's counsel, Ray Castro, outside the presence of the jury concerning his knowledge of Dequan's mental health history and competency. Castro testified that he was aware Dequan had been diagnosed with bipolar disorder and that he had received information concerning Dequan's mental health from Dequan himself, as well as from his mother. Castro testified that, early in his representation of Dequan on his pending charges, he had had Dequan examined for competency to stand trial. The trial court admitted a copy of the competency report finding Dequan competent to stand trial for his pending charges.

Defense counsel asked for a recess, stating that he needed the opportunity to "either bring in the doctor or get other information, including family history, that indicates a history of problems." Counsel reiterated that he had been unaware that

21

Dequan had any mental disabilities and stated that the evidence he sought to obtain was relevant "to whether or not he should be allowed to testify." The trial court stated:

> I can tell you right now that my opinion is going to be that [Dequan] is competent to testify based upon this report that has been presented to me in Defendant's Exhibit 1. Because that's what it says. It says he is competent. So, I see no further need to have another competency examination of him or have a competency trial on this witness.

The trial court agreed with defense counsel that a witness's mental health disorders and medications are appropriate impeachment evidence and stated, "I'm not saying you couldn't cross-examine [Dequan] about those things." The trial court deferred ruling on this issue until the next morning, and testimony resumed with a different witness.

> The next morning, defense counsel stated:
>
> Yesterday I had asked to voir dire a witness, Dequan Jackson. And during that voir dire, we discovered that Mr. Jackson had fairly extensive mental health history. I think that was a surprise to everybody. And in trying to cope with that, I'm going to ask the Court for a series of relief and order, and I believe that how you rule on each of those will be important.
>
> . . . .
>
> The basic outline of this, I believe, is that this young man suffers from a series of mental health disorders, including a long history, according to the records that we had on Defense Exhibit 2 [a "Special Needs Response Form" from the Harris County Jail that listed Dequan's medications and past diagnoses dating back to 2006] of state mental health hospitalization.

So, my first request for relief, because we can't un-ring the bell on this from what the jury heard, is to ask for a mistrial and then set this back and we can go perform the—get the records that we need to effectively deal with this and perhaps have a pretrial determination if [Dequan's] competency returns.

The Court has the authority to do that, and I realize that it's an extraordinary remedy, but I don't see a way to get around the fact that the jury has heard fairly damaging testimony to my client from the witness whose, I believe, mental health was in question and was not revealed until after that direct testimony.

So, we would first ask for a mistrial on that issue.

In the alternative, defense counsel orally requested a three-day continuance to allow him to obtain Dequan's mental health records so he could investigate and cross-examine Dequan on the issues of his past diagnoses, his medications, and his ability to recollect events. Defense counsel also requested that the trial court allow him "wide latitude" in cross-examining Dequan to further investigate these issues.

Before ruling on defense counsel's requests, the trial court heard further testimony from Castro outside the presence of the jury, as well as from Shauneka Jackson, Dequan's mother. Castro testified that it could be difficult to have a conversation with Dequan when he was not on medication, and he "had to sort of conduct a discussion very carefully with him." Castro did not believe that Dequan had any problems understanding the proceedings, although it was more difficult for him to understand when he was not taking his medication. Castro had not retained a mental health professional to examine Dequan for the purpose of discovering potential mitigating evidence. He testified that, every time he met with Dequan, he

23

would ask Dequan if he was taking his medication and Dequan would respond affirmatively. Castro believed that Dequan was truthful with him. Castro had met with Dequan three or four times in the months leading up to appellant's trial, and Castro had had no problems communicating with Dequan. Castro believed that Dequan was taking his medication, and he had not observed Dequan exhibit "any additional signs or symptoms of other mental health issues." Castro agreed with the State that, in his meetings with the prosecutors, Dequan could relay the events surrounding the shooting, and he had no concerns about Dequan's understanding of the events that had happened.

Shauneka Jackson testified that Dequan was diagnosed with ADD when he was a small child and received special education accommodations to assist with this diagnosis. She stated that, while Dequan had seen mental health professionals, he had never been admitted to a mental health facility. She took Dequan off his medication when he was around fifteen years old, or around 2013, and she had not had any concerns about his ability to function since then. She stated that Dequan can communicate and understand very well. On questioning from the trial court, Shauneka testified that, at the time of the shooting, Dequan was not taking medication, but she had not noticed him having problems remembering things or communicating. After hearing Shauneka's testimony, the trial court denied defense counsel's motion for mistrial.

24

The State argues that, on appeal, appellant "does not point to any particular error that serves as the basis for mistrial." We agree. Appellant moved for a mistrial after counsel conducted a voir dire examination of Dequan concerning his competency as a witness and after discovering that Dequan had a history of mental illness, including diagnoses of bipolar disorder and ADHD. The trial court expressly found that Dequan was competent to testify as a witness, and appellant does not challenge that determination on appeal. Appellant cites to no authority holding that the discovery that a witness has a history of mental health issues constitutes the type of error that is so prejudicial "that expenditure of further time and expense would be wasteful and futile" and a mistrial is required. *See Hawkins*, 135 S.W.3d at 77. The fact that a witness has a history of mental illness does not automatically make him incompetent to testify, and, under some circumstances, his history of mental illness may be a proper subject of cross-examination to the extent it impacts his credibility.[8] *See Virts*, 739 S.W.2d at 30; *Perry*, 236 S.W.3d at 867; *Scott*, 162 S.W.3d at 401.

Appellant did not argue that evidence of Dequan's mental health history had been improperly withheld by the State. Appellant made an unsworn oral motion for

[8] Although it occurred after the trial court denied appellant's motion for mistrial, defense counsel was able to cross-examine Dequan on his mental health history, including his diagnoses of bipolar and ADHD, his use of special education services while he was in school, the medication he had taken in the past, the fact that he was not taking his prescribed medication at the time of the shooting, and the fact that he had consumed codeine on the day he spoke with appellant about the shooting.

continuance to allow defense counsel time to obtain and review Dequan's mental health records, but, as appellant himself acknowledges on appeal, the Court of Criminal Appeals has held that a sworn written motion for continuance is required to preserve for appellate review any error concerning the trial court's denial of a request for continuance. *See Anderson v. State*, 301 S.W.3d 276, 279 (Tex. Crim. App. 2009) ("[I]f a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal."). Appellant has therefore failed to preserve any complaint that the trial court erred in denying his request for a continuance related to reviewing Dequan's mental health records.

We conclude that, at the time appellant moved for a mistrial, no error had occurred relating to allowing Dequan Jackson to testify. We therefore hold that the trial court did not abuse its discretion in denying appellant's motion for mistrial. *See Ocon*, 284 S.W.3d at 884 (stating that whether error requires mistrial depends on particular facts of case and that, in reviewing trial court's ruling on mistrial, we consider only arguments before trial court at time of ruling).

We overrule appellant's first issue.

### Lesser-Included Offense Instruction

In his second issue, appellant contends that the trial court erred when it refused his request for a jury instruction on the lesser-included offense of murder.

26

Specifically, appellant argues that while there is evidence that he killed Kiara Jackson, "[t]here was no other direct evidence that established conclusively that the Appellant was principally responsible for the intentional or knowing killings" of Demarquise Edwards and Terrell Paynes, and, thus, the offense of murder was a valid and rational alternative to the charged offense of capital murder.

## A.     *Governing Law*

The Code of Criminal Procedure provides that an offense is a lesser-included offense of a charged offense if:

(1)     it is established by proof of the same or less than all the facts required to establish the commission of the offense charged;

(2)     it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission;

(3)     it differs from the offense charged only in the respect that a less culpable mental state suffices to establish its commission; or

(4)     it consists of an attempt to commit the offense charged or an otherwise included offense.

TEX. CODE CRIM. PROC. ANN. art. 37.09; *Ritcherson v. State*, 568 S.W.3d 667, 670 (Tex. Crim. App. 2018).

We use a two-step analysis to determine if a defendant is entitled to a jury instruction on a lesser-included offense. *Ritcherson*, 568 S.W.3d at 670. First, we compare the statutory elements of the alleged lesser offense and the statutory elements of the charged offense plus any descriptive averments in the indictment.

27

*Id.* at 670–71; *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012) (stating that this step of analysis is question of law that does not depend on evidence raised at trial). Second, there must be evidence from which a rational jury could find the defendant guilty only of the lesser offense. *Ritcherson*, 568 S.W.3d at 671; *Cavazos*, 382 S.W.3d at 383 (stating that second step of analysis is question of fact and is based on evidence presented at trial). This step requires evidence that (1) directly refutes or negates other evidence establishing the greater offense and raises the lesser-included offense or (2) is susceptible to different interpretations, one of which refutes or negates an element of the greater offense and raises the lesser offense. *Ritcherson*, 568 S.W.3d at 671.

Evidence raising the lesser offense "must be affirmatively in the record," meaning a defendant is not entitled to a lesser-included offense instruction based on the absence of evidence, and the evidence must be "directly germane to the lesser-included offense." *Id.* In determining if there is evidence raising the lesser offense, we consider all of the evidence admitted at trial, not just the evidence presented by the defendant. *Id.* We cannot "pluck[] certain evidence from the record and examin[e] it in a vacuum." *Id.* at 677 (quoting *Enriquez v. State*, 21 S.W.3d 277, 278 (Tex. Crim. App. 2000)).

If there is more than a scintilla of evidence raising the lesser offense and negating or rebutting an element of the greater offense, the defendant is entitled to

28

an instruction on the lesser offense. *Id.* at 671. "It does not matter whether the evidence [raising the lesser offense] is controverted or even credible." *Id.*; *Cavazos*, 382 S.W.3d at 383 (stating that defendant is entitled to lesser-included offense instruction if some evidence from any source raises fact issue on whether defendant is guilty only of lesser offense, regardless of whether evidence is weak, impeached, or contradicted). Although this threshold is low, "it is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense"; instead, there must be some evidence "directly germane to the lesser-included offense" for the instruction to be warranted. *Sweed v. State*, 351 S.W.3d 63, 68 (Tex. Crim. App. 2011).

However, the evidence produced at trial must be sufficient to establish the lesser offense as a "valid, rational alternative" to the charged offense. *Cavazos*, 382 S.W.3d at 385 (quoting *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007)); *see Wortham v. State*, 412 S.W.3d 552, 557 (Tex. Crim. App. 2013). "Meeting this threshold requires more than mere speculation—it requires affirmative evidence that both raises the lesser-included offense and rebuts or negates an element of the greater offense." *Cavazos*, 382 S.W.3d at 385; *see Wortham*, 412 S.W.3d at 558. If the defendant either presents evidence that he committed no offense or presents no evidence, and there is no other evidence showing that he is guilty only of the lesser offense, then a lesser-included offense instruction is not required. *See Le v. State*, 479 S.W.3d 462, 473 (Tex. App.—Houston [14th Dist.] 2015, no pet.).

*B.    Analysis*

In this case, to prove that appellant committed the offense of capital murder as charged in the indictment, the State was required to establish that appellant, during the same criminal transaction, intentionally and knowingly caused the death of Kiara Jackson by shooting her with a firearm, that he intentionally and knowingly caused the death of Demarquise Edwards by shooting him with a firearm, and that he intentionally and knowingly caused the death of Terrell Paynes by shooting him with a firearm. *See* TEX. PENAL CODE ANN. § 19.03(a)(7). A person commits the offense of murder if he (1) intentionally or knowingly causes the death of an individual; (2) intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual; or (3) commits or attempts to commit a felony and, in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual. *See id.* § 19.02(b).

Appellant does not raise a challenge to the first step of the lesser-included offense analysis—whether, when comparing the statutory elements of the lesser and charged offenses and the descriptive averments in the indictment for the charged offense, murder is a lesser-included offense of capital murder. *See, e.g.*, *Cannon v. State*, 401 S.W.3d 907, 911 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd)

30

(holding that murder, as defined by Penal Code section 19.02(b)(2), is lesser-included offense of capital murder); *see also Hudson v. State*, 394 S.W.3d 522, 525 (Tex. Crim. App. 2013) (acknowledging same). We therefore turn to whether the evidence presented at trial entitled appellant to a jury instruction on the lesser-included offense of murder.

As evidence raising the lesser offense of murder, appellant points to Dequan Jackson's testimony that appellant told him that appellant "caught a body," meaning that he killed someone, and that he shot the complainant who was found in the bedroom—Kiara Jackson—while Bell shot Demarquise Edwards in the kitchen. Appellant argues that there was no direct evidence conclusively establishing that appellant "was principally responsible for the intentional or knowing killings" of Edwards and Paynes, as required to establish capital murder. Instead, the evidence established only that appellant was the principal actor in shooting Kiara Jackson. He therefore argues that because there is evidence that he shot and killed only one of the complainants, murder is a "valid, rational alternative" to the charged offense of capital murder. We disagree.

In arguing that the record contains no evidence that he was "principally responsible" for the deaths of Edwards and Paynes, and thus that he is entitled to an instruction on the lesser-included offense of murder, appellant fails to take into consideration the law of parties. Under the law of parties, a person is criminally

31

responsible for an offense committed by the conduct of another if, acting with intent to promote or assist the commission of the offense, the person solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. TEX. PENAL CODE ANN. § 7.02(a)(2). The Court of Criminal Appeals has stated:

> If it is proper to take a legal theory of liability into account for the purpose of determining the sufficiency of the evidence, and the evidence is found to be sufficient to support that theory, then it is necessarily proper to take it into account for the purpose of determining whether to submit a lesser-included offense.

*Yzaguirre v. State*, 394 S.W.3d 526, 529 (Tex. Crim. App. 2013); *see Young v. State*, 428 S.W.3d 172, 177 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd). In *Yzaguirre*, the court concluded that because the trial court included the law of parties in the abstract portion of the jury charge and it was supported by sufficient evidence presented at trial, "it was an issue that should be taken into account for the purpose of determining whether to submit a lesser-included offense." 394 S.W.3d at 531. It held that because there was no evidence, in light of the application of the law of parties, that the defendant in that case committed only the lesser offense of robbery, as opposed to the charged offense of aggravated robbery, the trial court correctly refused to submit an instruction on the lesser-included offense of robbery. *Id.*; *see Young*, 428 S.W.3d at 177–78 (taking law of parties into consideration when determining that no evidence was presented that defendant was guilty only of lesser

offense of robbery and, therefore, that defendant was not entitled to lesser-included offense instruction).

The jury charge in this case included an instruction on the law of parties, and the evidence presented at trial supported appellant's conviction for capital murder under the law of parties. Dequan Jackson testified that, the day after the shootings, he met up with appellant, Bell, and Fields at an apartment at Haverstock Hills and they all had stacks of money and "drank." During a later conversation that occurred while walking around Haverstock Hills, Dequan asked appellant where the money and drank came from, and appellant told him, "I caught a body," which Dequan interpreted to mean that appellant had killed someone. Appellant told him, "We ran in. Like, G [Fields] put us on a lick," meaning that the group had planned to rob someone. Appellant told Dequan that Bell and Fields were involved and that "[t]hey ran in, started shooting." Dequan testified: "They just start shooting. [Appellant] went inside the room and started shooting the female [Kiara Jackson], and [Bell] was over the counter shooting the dude [Demarquise Edwards] that was in the kitchen." Dequan stated that appellant told him that he took a handgun from the apartment, Bell "grabbed some of the drank and the money," and the group left Edwards's apartment. Dequan and appellant returned to the Haverstock Hills apartment, and Dequan saw the gun that appellant had taken from Edwards's apartment.

33

Other evidence in the record, aside from Dequan Jackson's testimony, also supports the law of parties. Although there were no eyewitnesses to the shooting itself, Bradley and Coleman observed appellant, Bell, and Fields together at the Arbor Court apartments shortly before the shooting occurred. Bradley and Coleman also witnessed three men fleeing from the direction of Edwards's apartment after the shooting and identified appellant as one of these men. Comparisons of the fired cartridge casings recovered from the scene and the projectiles recovered during the autopsies of the complainants reflected that three different firearms were used during the shooting.

Appellant has identified no evidence in the record suggesting that he was not acting in concert with Bell and Fields when the men entered Edwards's apartment and shot Edwards, Paynes, and Kiara Jackson. Taking into account the law of parties, as we must when determining if the trial court properly denied a requested instruction on a lesser-included offense, the testimony from Dequan Jackson that appellant shot only Kiara Jackson, but not Paynes or Edwards, does not constitute affirmative evidence that refutes or negates the charged offense of capital murder and raises the lesser offense of murder. *See Ritcherson*, 568 S.W.3d at 671; *see also Yzaguirre*, 394 S.W.3d at 531 (concluding that because law of parties was included in abstract portion of charge and was supported by evidence at trial, trial court

properly took this theory of liability into account when refusing to submit instruction on lesser-included offense); *Young*, 428 S.W.3d at 177–78 (concluding same).

Under the facts of this case, evidence that appellant told Dequan Jackson that he shot Kiara Jackson and that Bell shot Edwards does not constitute evidence from which a rational jury could find appellant guilty *only* of the lesser offense of murder. *See Ritcherson*, 568 S.W.3d at 671. Thus, in this case, the evidence presented at trial is not sufficient to establish murder as a "valid, rational alternative" to the charged offense of capital murder. *Cavazos*, 382 S.W.3d at 385. We therefore hold that the trial court did not err when it refused to submit an instruction on the lesser-included offense of murder. *See Ritcherson*, 568 S.W.3d at 671.

We overrule appellant's second issue.

**Sentencing Scheme for Juvenile Defendants in Capital Cases**

In his third issue, appellant contends that Texas's statutory sentencing scheme providing that juvenile defendants convicted of capital felonies are automatically sentenced to confinement for life with the possibility of parole after forty years is facially unconstitutional based on the United States Supreme Court's decision in *Miller v. Alabama*. Specifically, appellant argues that this sentencing scheme denies him procedural due process because he is not allowed an individualized sentencing hearing, nor is he allowed any meaningful opportunity for release from confinement.

In *Miller v. Alabama*, the United States Supreme Court addressed whether statutory sentencing schemes that mandated a sentence of confinement for life without the possibility of parole for juvenile defendants convicted of capital felonies violated the Eight Amendment's prohibition of cruel and unusual punishment. *See* 567 U.S. 460, 465 (2012). The *Miller* Court, relying on prior cases involving sentencing practices for juvenile defendants in capital felonies, noted that "children are constitutionally different from adults for purposes of sentencing" and that, because juvenile defendants "have diminished capacity and greater prospects for reform," they are "less deserving of the most severe punishments." *Id.* at 471 (quoting *Graham v. Florida*, 560 U.S. 48, 68 (2010)). The Court stated:

> [C]hildren have a "lack of maturity and an underdeveloped sense of responsibility," leading to recklessness, impulsivity, and heedless risk-taking. Second, children "are more vulnerable . . . to negative influences and outside pressures," including from their family and peers; they have limited "contro[l] over their own environment" and lack the ability to extricate themselves from horrific, crime-producing settings. And third, a child's character is not as "well formed" as an adult's; his traits are "less fixed" and his actions less likely to be "evidence of irretrievabl[e] deprav[ity]."

*Id.* (quoting *Roper v. Simmons*, 543 U.S. 551, 569–70 (2005)). "[T]he distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes," as "the case for retribution is not as strong with a minor as with an adult," and the goal of rehabilitation of a juvenile defendant "could not justify" a sentence of life without

parole because it "reflects 'an irrevocable judgment about [an offender's] value and place in society,' at odds with a child's capacity for change." *Id.* at 472–73 (quoting *Graham*, 560 U.S. at 71, 74).

The mandatory sentencing schemes at issue in *Miller*—requiring a juvenile defendant convicted of a capital felony to be sentenced to confinement for life without the possibility of parole—prevented the sentencing authority from taking into account considerations such as the defendant's youth, which impermissibly prohibited the sentencing authority "from assessing whether the law's harshest term of imprisonment proportionately punishes a juvenile offender." *Id.* at 474. The Court also noted that "mandatory penalties, by their nature, preclude a sentencer from taking account of an offender's age and the wealth of characteristics and circumstances attendant to it." *Id.* at 476. The Court stated:

> Mandatory life without parole for a juvenile precludes consideration of his chronological age and its hallmark features—among them, immaturity, impetuosity, and failure to appreciate risks and consequences. It prevents taking into account the family and home environment that surrounds him—and from which he cannot usually extricate himself—no matter how brutal or dysfunctional. It neglects the circumstances of the homicide offense, including the extent of his participation in the conduct and the way familial and peer pressures may have affected him. Indeed, it ignores that he might have been charged and convicted of a lesser offense if not for incompetencies associated with youth—for example, his inability to deal with police officers or prosecutors (including a plea agreement) or his incapacity to assist his own attorneys.

*Id.* at 477–78. The Court therefore held that "the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders," noting that such a sentencing scheme, which "mak[es] youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence," poses "too great a risk of disproportionate punishment." *Id.* at 479.

Although Texas requires a sentence of life without parole for persons who are eighteen years of age or older when they commit capital felonies and the State has not sought the death penalty, it does not require this sentence for juvenile defendants. Instead, Penal Code section 12.31(a)(1) provides that a person convicted of a capital felony in a case in which the State does not seek the death penalty "shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . *life*, if the individual committed the offense when younger than 18 years of age." *Compare* TEX. PENAL CODE ANN. § 12.31(a)(1) (emphasis added) *with id.* § 12.31(a)(2) ("An individual adjudged guilty of a capital felony in a case in which the state does not seek the death penalty shall be punished by imprisonment in the Texas Department of Criminal Justice for . . . *life without parole*, if the individual committed the offense when 18 years of age or older.") (emphasis added); *see Ex parte Maxwell*, 424 S.W.3d 66, 68 n.3 (Tex. Crim. App. 2014) (setting out history of section 12.31(a) and its amendments). Government Code section 508.145, which addresses an individual's eligibility for release on parole, provides that an individual serving a

life sentence under Penal Code section 12.31(a)(1) for a capital felony, that is, an individual who was younger than eighteen years old at the time of the offense, "is not eligible for release on parole until the actual calendar time the inmate has served, without consideration of good conduct time, equals 40 calendar years." TEX. GOV'T CODE ANN. § 508.145(b).

The Court of Criminal Appeals has addressed whether Texas's statutory scheme—requiring that juvenile defendants convicted of capital felonies be sentenced to confinement for life with the possibility of parole after serving forty years—violates *Miller* because the Texas scheme does not allow for the individualized sentencing of juvenile defendants. In *Lewis v. State*, the Court of Criminal Appeals discussed *Miller* and stated that *Miller*'s holding is "narrow" and that juvenile defendants "are still constitutionally eligible for life without parole, but *Miller* requires an individualized determination that a defendant is 'the rare juvenile offender whose crime reflects irreparable corruption.'" 428 S.W.3d 860, 863 (Tex. Crim. App. 2014) (quoting *Miller*, 567 U.S. at 479–80). The court then noted that *Miller* "does not forbid mandatory sentencing schemes." *Id.* It stated that the statutory schemes at issue in *Miller* were unconstitutional because they "denied juveniles convicted of murder all possibility of parole, leaving them no opportunity or incentive for rehabilitation," but a sentence of life in prison with the possibility for parole—required by Penal Code section 12.31(a)(1)—"leaves a route for juvenile

offenders to prove that they have changed while also assessing a punishment that the Legislature has deemed appropriate in light of the fact that the juvenile took someone's life under specified circumstances." *Id.*

The Court of Criminal Appeals thus rejected Lewis's argument that *Miller* requires an individualized sentencing determination for all juvenile defendants convicted of capital felonies. *Id.* Instead, *Miller* "requires an individualized hearing only when a juvenile can be sentenced to life without the possibility of parole," which is no longer possible under Texas's sentencing scheme. *Id.* at 863–64. The court also rejected the argument that *Miller* should be read to apply to whatever the state legislature determines to be the "harshest possible penalty for juveniles," even if that is life *with* the possibility of parole, as is the case in Texas. *Id.* at 864. The court pointed to several statements in *Miller* indicating that when the *Miller* Court referred to "the harshest possible punishment," it was "referring to sentencing a juvenile to life without parole." *Id.* The court therefore held: "Because the holding in *Miller* is limited to a prohibition on mandatory life without parole for juvenile offenders, [the defendants in *Lewis*] are not entitled to punishment hearings." *Id.*

As appellant acknowledges, the Court of Criminal Appeals and intermediate appellate courts, including this Court, have followed *Lewis* and held that Texas's statutory sentencing scheme for juvenile defendants convicted of capital felonies

does not violate *Miller* and is not unconstitutional.[9] *See Turner v. State*, 443 S.W.3d 128, 129 (Tex. Crim. App. 2014) (per curiam) (following *Lewis* and holding that juvenile defendant was not entitled to individualized punishment hearing but, because defendant was sentenced under prior version of Penal Code section 12.31(a) that required juvenile defendants in capital cases to be sentenced to life without possibility of parole, also reforming judgment to change sentence to life with possibility of parole); *McCardle v. State*, 550 S.W.3d 265, 269–70 (Tex. App.—Houston [14th Dist.] 2018, pet. ref'd) (following *Lewis* and also rejecting argument that requiring juvenile defendant convicted of capital felony to serve forty years before becoming eligible for parole is unconstitutional as "de facto life sentence"); *Guzman v. State*, 539 S.W.3d 394, 402–06 (Tex. App.—Houston [1st Dist.] 2017, pet. ref'd) (following *Lewis* and rejecting argument that Government Code section 508.145(b) is facially unconstitutional because requiring juvenile defendant to serve forty years before becoming parole-eligible does not equate to sentence of life without parole); *Shalouei v. State*, 524 S.W.3d 766, 769 (Tex. App.—Houston [14th Dist.] 2017, pet. ref'd) (noting that United States Supreme Court has held that states may remedy violation of *Miller* "by permitting juvenile homicide offenders to be

---

[9]     Appellant acknowledges this adverse authority, including the Court of Criminal Appeals' decision in *Lewis v. State*, and states that he "raises this claim in an adversarial fashion solely for the purpose of preserving error for possible further review."

41

considered for parole, rather than by resentencing them") (quoting *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016)).

"When the Court of Criminal Appeals has deliberately and unequivocally interpreted the law in a criminal matter, we must adhere to its interpretation under the dictates of vertical stare decisis." *Guzman*, 539 S.W.3d at 404 (quoting *Mason v. State*, 416 S.W.3d 720, 728 n.10 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd)). In *Lewis*, the Court of Criminal Appeals "deliberately and unequivocally" held that Texas's statutory sentencing scheme for juvenile defendants convicted of capital felonies does not violate *Miller* and is not unconstitutional. *See* 428 S.W.3d at 863–64. We are bound by stare decisis to follow this holding. *See Matthews v. State*, 513 S.W.3d 45, 61–62 (Tex. App.—Houston [14th Dist.] 2016, pet. ref'd) (rejecting argument that Penal Code section 12.31(a)(1) is facially unconstitutional because Court of Criminal Appeals has unequivocally spoken on and rejected argument). We therefore hold that Texas's statutory sentencing scheme for juvenile defendants convicted of capital felonies is not facially unconstitutional.

We overrule appellant's third issue.

## Conclusion

We affirm the judgment of the trial court.

                                   Evelyn V. Keyes
                                   Justice

Panel consists of Justices Keyes, Kelly, and Goodman.

Justice Goodman, concurring.

Publish.  TEX. R. APP. P. 47.2(b).